**Beverly WILKINS, Respondent,**

v.

**BOARD OF REGENTS OF HARRIS-STOWE STATE UNIVERSITY, et al., Appellants.**

**No. ED 104354**

Missouri Court of Appeals, Eastern District, **DIVISION FOUR**.

FILED: June 6, 2017

528

Joshua D. Hawley, Colleen Joern Vetter, P.O. Box 861, St. Louis, MO 63188, for appellant.

Michael S. Meyers, 2237 Equestrian Loop S, Salem, OR 97302, for respondent.

KURT S. ODENWALD, Judge

Introduction

The Board of Regents of Harris-Stowe State University ("the Board") appeals from the judgment of the trial court entered following a jury trial. The jury found the Board liable for violating the Missouri Human Rights Act ("MHRA")[1] when it terminated the employment of Beverly W. Wilkins ("Wilkins"). The jury awarded Wilkins $1,350,000 in compensatory damages and $3,500,000 in punitive damages. On appeal, the Board raises five points. First, the Board alleges instructional error with regard to Wilkins's claim for future damages. The Board next asserts evidentiary error in allowing the presentation of a Missouri statute, Section 174.150, to the jury.[2] The Board's remaining points each claim error with regard to the compensatory and punitive damages award.

The trial court did not err in instructing the jury on future damages because sufficient evidence of lost future income and future emotional distress was introduced at trial to support the instruction. The record shows that the Board did not object to the discussion of Section 174.150 at trial and also did not preserve its challenge to the submissibility of punitive damages. Finally, we hold that the trial court acted within its discretion and did not err in refusing to remit the jury's compensatory-damage and punitive-damage awards. Accordingly, we affirm the judgment of the trial court.

Factual and Procedural History

In 2001, Wilkins, a Caucasian woman, was hired to teach at Harris-Stowe State University ("HSSU") as an adjunct instructor in its Teacher Education Department. HSSU is a "historically black college." The majority of the faculty members in HSSU's Teacher Education Department were African-American. Wilkins later became a full-time instructor and began to teach additional classes over the summer. From 2001 to 2009, Wilkins's employment

---

1. Sections 213.010-137.

2. All statutory references are to RSMo. (2000 & Cum. Supp. 2013), unless otherwise stated.

contract was regularly renewed, and Wilkins successfully taught as a non-tenure-track professor. In her final year of employment, the Board paid Wilkins $62,776 in salary and benefits. Wilkins also earned on average an additional $4,000 to $5,000 a year for teaching summer classes. Wilkins received excellent reviews and was considered an important member of HSSU's Teacher Education Department.

In 2009, the Board sought a new dean for HSSU's Teacher Education Department. During its search, the Board appointed Dr. Latisha Smith ("Dr. Smith"), an African-American woman, as a temporary co-chair for the department. After Dr. Smith's appointment, a faculty member within the Teacher Education Department sent an email to HSSU administrators, including the president, vice-president, and the human resources director. This email reported that Dr. Smith had repeatedly proclaimed her belief in "black power." The faculty member claimed to be upset "to know that we have an interim leader that has voiced her prejudice so openly to me and others. This flagrant prejudice should not be tolerated or accepted." A high-ranking HSSU official instructed the faculty member not to press her complaints or her ability to obtain tenure would be jeopardized. The Board subsequently promoted Dr. Smith to Dean of the Teacher Education Department. Dr. Smith, in her capacity as dean, became Wilkins's supervisor.

In April 2010, the Board learned that its state funding for the next fiscal year would be reduced by approximately $566,000. To balance HSSU's revenues with its expenditures, HSSU's financial administrators prepared an operating budget that eliminated open and unfilled positions. The op-erating budget also required the termination of two staff employees. The savings from these processes totaled $572,000.

The operating budget further provided for the "reorganization" of certain staff and faculty positions. The reorganization proposed the termination of eight additional employees, including two faculty members. Notably, the reorganization budget provided for the eventual replacement of the two terminated faculty members. As a result, the reorganization was conceptualized as budget-neutral because it would result in "a wash" with no overall savings derived by the university.

Dr. Smith recommended to HSSU's vice-president that the Board terminate Wilkins. HSSU's vice-president then composed a draft layoff list which included Dr. Smith's recommendation that Wilkins be terminated. Wilkins was included on the layoff list presented to the Board by HSSU officials. The Board approved the budget on June 22, 2010. The Board also sanctioned the purported reorganization, including Dr. Smith's recommendation to terminate Wilkins, as well as the corresponding plan to hire a replacement for Wilkins's position. The termination of Wilkins did not comport with HSSU's existing promulgated policy on reducing its work force. The Board, the entity responsible for providing oversight to HSSU, previously issued policies and procedures for the university to follow in its employment decisions. Under the reduction-in-force policy, HSSU was required to terminate non-adjunct faculty by seniority.[3] In comparison to other non-tenure-track faculty, Wilkins had more seniority than two African-American instructors.

---

3. The reduction-in-force policy also provided for the recall of laid-off employees within a

certain amount of time.

Contrary to its internal policies, HSSU officials terminated Wilkins over the less senior African-American instructors. On June 30, 2010, Wilkins met with HSSU officials, including the vice-president and human resources director. The human resources director handed Wilkins a letter informing her that she would be terminated as part of a reorganization effort due to a reduction in state funding. Wilkins was initially permitted to finish her summer class. Wilkins asked why she was selected for termination. The vice-president and human resources director refused to explain to Wilkins why she was terminated over other faculty with less seniority.

Wilkins notified the president, vice-president, Dr. Smith, and the human resources director by email that her termination did not comply with HSSU's policies and that she was contemplating legal action. HSSU's officials considered this email to be a complaint of race discrimination. HSSU policy required that *all* complaints of race discrimination in the employment process were to be investigated. The Board and top-level HSSU administrators never investigated Wilkins's complaint.

Upon returning to teach her summer class, Wilkins was asked by her students if she had been fired. Wilkins told her students that, although she would finish the summer course, she would not return the following semester. Knowing that Wilkins's daughter was an attorney, the students asked Wilkins if her daughter could help her. Wilkins acknowledged that her daughter was "not that kind of an attorney."

Wilkins was summoned the following week to attend a meeting with HSSU administrators, including the human resources director, the vice-president, and the assistant vice-president of academic affairs. At the meeting, HSSU officials fired Wilkins from teaching her summer class and instructed her to leave campus

immediately. The human resources director gave Wilkins a letter informing her that she was terminated for "inappropriate activities." Wilkins pressed HSSU officials to explain her "inappropriate activities." HSSU officials refused to tell her. HSSU officials placed Wilkins's termination letter, including the notation that she was fired for "inappropriate activities," in her employment file.

The president of HSSU and a representative of the Board both testified that they had heard allegations that Wilkins told her students that she had been discriminated against by HSSU, that she was going to sue HSSU, and that she would impede HSSU's accreditation process. No individual student was identified as making these allegations, and no investigation was conducted by HSSU officials or the Board to discover the truth of these claims. HSSU's usual practice was to investigate any claims of employee misconduct. HSSU's conduct regarding Wilkins deviated from its standard practice, which often included interviews of witnesses and the accused employee, hearings with evidence presented, and decisions containing formal findings.

After Wilkins was fired from her summer course, the Board immediately moved forward with hiring Wilkins's replacement as a part of its purported reorganization plan. On August 2, 2010, an HSSU official, the assistant vice-president of academic affairs, listed Dr. Betty Porter Walls ("Dr. Walls") as a potential replacement in an email to HSSU administrators. In the email, Dr. Walls was expressly identified as being "black." The identification of Dr. Walls's race was included in HSSU's Academic Affairs Reorganization Plan. Ultimately, the Board hired Dr. Walls to a full-time contract. The Board also hired Dr. Savannah Young, another African-American instructor, to assume some of Wilkins's

other teaching duties. In this period of budget-cutting, the net additional cost to HSSU for replacing Wilkins was approximately $23,000.

Wilkins filed suit against HSSU and the Board, claiming that her termination was in violation of the MHRA.[4] In Count I, Wilkins alleged that HSSU and the Board discriminated against her because of her race in deciding to terminate or not renew Wilkins's annual teaching contract. In Count II, Wilkins alleged that HSSU and the Board terminated her summer-teaching assignment in retaliation for raising a race-discrimination claim.

During discovery, the trial court ordered the Board to preserve Dr. Smith's email account. In violation of this order, the Board deleted Dr. Smith's email account. Because of this violation, the trial court ruled, as a sanction, that the following allegations were deemed admitted: Dr. Smith's email account contained statements expressing her desire to make the Teacher Education Department "blacker" and that she recommended terminating Wilkins's employment.

The case proceeded to a jury trial. At trial, Wilkins testified about the impact of the termination on her life. Wilkins testified that, since a very early age, she wanted to be a teacher. Growing up in a poor family, it was Wilkins's public school teachers who instilled confidence in her and made her feel smart. This experience imparted in Wilkins a desire to become a teacher and to help children from similar backgrounds.

After graduating from high school, Wilkins attended Harris Teacher's College (the precursor to HSSU). Wilkins explained how Harris Teachers College (HSSU) made such a difference in her life.

After graduating from college, Wilkins taught at an elementary school and later became a principal. Wilkins subsequently accepted a teaching position at HSSU because she wanted to teach others to become educators and she knew that many of the students at HSSU shared her background. Wilkins testified that she loved teaching future educators and that teaching was her life.

When the Board terminated her annual contract, Wilkins recalled being in shock and continuing disbelief, especially because she had received an excellent evaluation from administrators just prior to her termination. Wilkins testified that the termination was very personal, as previously friendly administrators refused to explain why she was selected for termination or how she had committed the alleged misconduct. After Wilkins was fired from her summer-teaching position, HSSU's vice-president personally escorted Wilkins to her cubicle. The vice-president then rifled through Wilkins's files, ripped pictures off the wall, and ignored Wilkins repeated pleas for information. Wilkins was then marched to her car and off the campus. Wilkins was embarrassed and humiliated by this process; she felt that she was treated similarly to a former HSSU professor who had been fired and escorted from campus after lying about a previous child-molestation conviction.

Wilkins expressed concern that her firing for "inappropriate activities" tarnished her professional reputation. Before her termination, Wilkins had planned to teach at HSSU for at least ten to twelve more years. Wilkins, though, was hopeful that she could work even longer—at least into her upper seventies—because many people of that age were still teaching at HSSU. Since her termination, Wilkins testified

---

4. Wilkins also filed suit against Dr. Smith, the vice-president of HSSU, and the president of HSSU. However, Wilkins dismissed the suit as to these three individuals before trial.

that she regularly checked for comparable jobs in higher education within commuting distance of St. Louis; however, no such openings were available. Wilkins could have applied for work as a principal in the city school districts. However, Wilkins did not seek these positions because principals generally work twice as many hours, experience significantly more stress, are on-call for school-related emergencies, are tasked with administering student discipline, must interact with parents, and are required to complete significant amounts of paperwork.

The Board vigorously challenged its liability and Wilkins's damages at trial. In its defense, the Board pointed out that none of the board members, or any HSSU senior administrators, stated that race factored into the decision to terminate or hire employees. The Board maintained that Wilkins's firing was the product of HSSU's outdated operating structure. Further, HSSU officials testified that reorganization was required to balance the budget, even though new employees were hired to fulfill the eliminated teaching positions. The Board also stated that nine of the twelve layoffs were African-Americans. Notably, the only eliminated faculty member in the Teacher Education Department was Caucasian. Finally, the Board asserted that Wilkins did not provide sufficient evidence to support her claim for lost future income because she did not apply for any other employment since her termination.

At the close of all the evidence, the Board moved for a directed verdict, arguing, among other things, that there was insufficient evidence of future damages because Wilkins could still obtain subsequent employment. The trial court denied the Board's motion. In the instruction conference, the Board objected to jury instructions permitting the jury to consider future damages and punitive damages. The trial court overruled the Board's objections, and instructed the jury with regard to both future and punitive damages.

The jury found in Wilkins's favor and against the Board on both Count I and Count II. The jury awarded Wilkins $1,350,000 in compensatory damages and $3,500,000 in punitive damages. The trial court also awarded Wilkins her attorney's fees and costs. The Board filed post-trial motions, arguing for judgment notwithstanding the verdict ("JNOV"), remittitur, and for a new trial. The trial court denied the Board's post-trial motions. This appeal follows. On appeal, Wilkins moved for reasonable attorney's fees and costs, which we will address *infra*.

## Points on Appeal

The Board raises five points. Point One alleges that the trial court erred in instructing the jury on future damages. In Point Two, the Board argues that the trial court erroneously permitted Wilkins to discuss and explain Section 174.150 to the jury because the statute was irrelevant to Wilkins's claim and misled the jury to the applicable law. Point Three charges the trial court with error for failing to remit the jury's award of compensatory damages because the verdict was grossly excessive and not supported by the evidence. Finally, the Board claims that the trial court erred in submitting the issue of punitive damages to the jury (Point Four) and that the trial court erred in failing to remit the jury's award of punitive damages (Point Five).

## Discussion

### I. Final Judgment

Initially, we must *sua sponte* determine if the Board has appealed from a final judgment. Neither party contends that the trial court failed to enter a final judgment or that we lack jurisdiction to resolve the

appeal. However, some confusion exists regarding the finality of the trial court's judgment because the trial court entered judgment on Wilkins's claims against the Board, but not on Wilkins's claims against HSSU.

■ Before addressing the merits of the appeal, we must first determine whether we have jurisdiction. Johnston v. Saladino Mech., 504 S.W.3d 138, 140 (Mo. App. W.D. 2016). The right to appeal is purely statutory, and therefore no right to appeal exists unless specifically delineated by statute. Buemi v. Kerckhoff, 359 S.W.3d 16, 20 (Mo. banc 2011). Applicable here, Section 512.020 provides in part that "any party to a suit aggrieved by any judgment of any trial court in any civil cause from which an appeal is not prohibited by the constitution, nor clearly limited in special statutory proceedings, may take his or her appeal to a court having appellate jurisdiction from any: ... (5) [f]inal judgment in the case...." Under this provision, therefore, "[a]ppellate review requires a final judgment, and where the judgment appealed lacks finality, we lack jurisdiction and must dismiss the appeal." Shea v. Gaither, 389 S.W.3d 725, 728 (Mo. App. E.D. 2013) (citing Columbia Mut. Ins. Co. v. Epstein, 200 S.W.3d 547, 549 (Mo. App. E.D. 2006)).

■ In order to constitute a final judgment,[5] "the judgment must dispose of all parties, resolve all issues, and leave nothing for future determination." Lane House Constr., Inc. v. Sithole, 504 S.W.3d 102, 106 (Mo. App. E.D. 2016). Initially, Wilkins sued the Board, HSSU, and three different individual administrators. Wilkins dismissed the three different individual administrators from the suit and tried its case against the Board and HSSU. At trial, the parties identified the Board as the proper defendant. Wilkins indicated that she would dismiss HSSU. However, she never did. In its judgment, the trial court only entered judgment against the Board.

Despite not addressing Wilkins's claims against HSSU, the trial court adjudicated all claims against all parties when it entered judgment against the Board. HSSU is not a separate legal entity from the Board. See Bd. of Regents of Southwest Mo. State Univ. v. Harriman, 792 S.W.2d 388, 391 (Mo. App. S.D. 1990) (finding that a public university is not a separate legal entity from its statutorily established governing board). Accordingly, describing a public university's governing board by its fictitious name does not name a legal entity separate from the board, but rather identifies the board by its misnomer. Id. at 392-93.

Here, Wilkins expressly identified the Board as a party in the pleadings and correctly alleged that the Board was responsible for the operation of HSSU. Wilkins's naming of HSSU only identified the Board by its misnomer. See id. As HSSU is not a separate legal entity, but rather only a duplicative name for the Board, the judgment adjudicated all claims against the sole remaining defendant. Therefore, the trial court's judgment was a final, appealable judgment, and we have authority to review the appeal on its merits.[6]

5. Rule 74.01(b) provides an exception to the final-judgment requirement. Buemi, 359 S.W.3d at 20. The Rule permits the "trial court to enter an appealable final judgment as to fewer than all claims or parties in the case and to certify that there is no just reason to delay the appeal of that judgment." Id. However, Rule 74.01(b) does not apply here as the trial court never made an express determination that there was no just reason to delay the appeal of its judgment.

6. Although we conclude that the trial court's judgment resolved all issues as to all parties, we find that the better practice, in order to avoid any question of finality, would be to

## II. Point One—Instructional Error on Future Damages

In Point One, the Board charges the trial court with instructional error pertaining to Jury Instruction No. 8.[7] Instruction No. 8, which was patterned after MAI 4.01,[8] instructed the jury on Wilkins's compensatory damages.[9] The instruction called for the jury to award Wilkins a sum that it believed would fairly and justly compensate her for damages that she sustained "and is reasonably certain to sustain in the future" as a direct result of her termination. MAI 4.01 permits the addition of the elective phrase, "and is reasonably certain to sustain in the future[,]" to the instruction if the phrase is "supported by the evidence." MAI 4.01, Notes on Use 2.

Wilkins's proffered jury instruction included the elective phrase—"and is reasonably certain to sustain in the future"—which was given by the trial court over the Board's objection. Here, the Board argues that the elective phrase in Instruction No. 8 erroneously permitted the jury to award future damages because Wilkins's evidence on future damages was speculative, scant, and legally insufficient.

### A. Waiver

■ Before addressing the merits of the Board's first point, Wilkins argues that the Board waived any challenge to the submissibility of future damages. At trial, the Board contended in its motion for directed verdict, and renewed post-trial, that Wilkins failed to make a submissible case for future damages. Wilkins, counters that the Board abandoned this submissibility challenge on appeal because the Board's point on appeal asserts only instructional error. Wilkins correctly states that the Board does not charge the trial court with error on appeal for denying the Board's motion for JNOV. Wilkins maintains that a litigant preserves an allegation of error relating to the plaintiff's failure to make a submissible claim for future damages *only* by 1) filing a motion for directed verdict; 2) renewing the claim of error in a post-trial motion; and 3) then challenging the trial court's submission on appeal. Wilkins posits that the Board's objections to the jury instruction preserved nothing pertaining to the submissibility of her claim for appellate review, which can only be raised on appeal by challenging the trial court's denial of the motion for JNOV.

We agree that challenges to the submissibility of a claim are reviewed under the procedure for a directed verdict outlined in Rule 72.01.[10] Rule 72.01(b) provides, in

---

reflect in an intended final judgment the formal dismissal of HSSU from the proceedings. See U.S. Bank, N.A. v. Smith, 470 S.W.3d 17, 21 n.2 (Mo. App. W.D. 2015).

7. The Board's point relied on states that "[t]he trial court erred in submitting Instruction No. 8 regarding future damages because the instruction at issue misdirected, [misled], or confused the jury resulting in prejudice to [the Board] in that the evidence was legally insufficient to support a claim for future damages. . . ."

8. All references to the MAI and its Notes on Use are to versions found in Missouri Approved Jury Instructions-Civil (7th ed. 2012).

9. The full text of the jury instruction pertaining to Wilkins's compensatory damages read:
 If you find in favor of plaintiff, then you must award plaintiff such sum as you believe will fairly and justly compensate plaintiff for any damages you believe plaintiff sustained and is reasonably certain to sustain in the future as a direct result of the occurrence mentioned in the evidence.
 If you find that plaintiff failed to mitigate damages as submitted in Instruction Number 9 in determining plaintiff's total damages you must not include those damages that would not have occurred without such failure.

10. All rule references are to Mo. R. Civ. P. (2016).

part, "a party may move for a directed verdict at the close of all the evidence. Whenever such motion is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion." Wilkins suggests that Rule 72.01 sets forth the exclusive procedure to challenge the submissibility of a claim. See Walsh v. City of Kan. City, 481 S.W.3d 97, 112 (Mo. App. W.D. 2016) (stating that the failure to move "for a directed verdict at the close of all the evidence waives any contention that plaintiff failed to prove a submissible case.")

Wilkins avers that once the trial court ruled on the Board's motion for directed verdict at the close of all evidence, the matter was deemed submitted to the jury subject to a later determination of a party's rights only after trial. Wilkins thus contends that the Board's objections to the issue of submissibility on future damages raised during the instruction conference were too late, and hence, inconsequential. Cf. Hogate v. Am. Golf Corp., 97 S.W.3d 44, 47 (Mo. App. E.D. 2002) (ruling that, to preserve a point for appeal, a party was not required to raise an objection during the instruction conference on a point already made in his or her motion for directed verdict and renewed post-trial). Wilkins theorizes that the only manner in which the Board could attack the submissibility of the issue of future damages was through its motion for directed verdict, renewed post-trial, and then challenged on appeal.

We are unwilling to so limit the Board's ability to challenge the trial court's submission of the future damages instruction. See Howard v. City of Kan. City, 332 S.W.3d 772, 789-91 (Mo. banc 2011). In a case addressing whether a party waived its challenge to the inclusion of the same instructional phrase at issue, the elective phrase in MAI 4.01, the Supreme Court of Missouri in Howard considered whether any objections were made at the instruction conference *and* if the issue was raised in the motion for directed verdict. Id. at 789-90. In so doing, the Supreme Court stated that to the "extent that this point attempts to challenge the instruction given," a party must timely and sufficiently object to the giving of the instruction before the jury retires to consider the verdict in order to preserve the matter for appellate review. Id. at 790. The Board did so.

We further note that the issue of whether the evidence presented at trial supports the modification of MAI 4.01 to allow the elective phrase "and is reasonably certain to sustain in the future," has been treated as a claim of instructional error by other Missouri appellate courts. See, e.g., Westerman v. Shogren, 392 S.W.3d 465, 470 (Mo. App. W.D. 2012) (finding that defendant waived his objection to the inclusion of future damages in the jury instruction by failing to object to the instruction as given); Dierker Assocs., D.C., P.C. v. Gillis, 859 S.W.2d 737, 745 (Mo. App. E.D. 1993) (finding no prejudicial instructional-error when a jury instruction including the elective phrase "and is reasonably certain to sustain in the future" was given to the jury).

Here, the Board not only challenged the submission of future damages in its motion for directed verdict, but also objected at trial to the future-damage language as given in the instruction, and tendered an alternative instruction without the future-damage language. The trial court then carefully considered the Board's objection, Wilkins's proffered Instruction No. 8, and the Board's submitted alternative instruction. The trial court reflected on the Board's argument that insufficient evidence was introduced at trial to support the insertion of the elective phrase on fu-

ture damages due to Wilkins's purported lack of continued emotional distress and to the speculative nature of her future economic loss. The trial court rejected these arguments and submitted Instruction No. 8 to the jury.

We find that the Board properly challenged the wording of the instruction as given before the trial court. Accordingly, the Board has sufficiently presented its arguments on the instruction to the trial court and has preserved the point on appeal. We will review the merits of the Board's Point One.

### B. Standard of Review

We review instructional error de novo. Howard, 332 S.W.3d at 789. We will reverse a jury's verdict only if the party asserting instructional error demonstrates that "the instruction at issue misdirected, misled, or confused the jury, resulting in prejudicial error." Id. at 790. In reviewing the purportedly erroneous instruction, this Court will view the evidence and any reasonable inferences in the light most favorable to the instruction. McBryde v. Ritenour Sch. Dist., 207 S.W.3d 162, 168 (Mo. App. E.D. 2006).

### C. Sufficient Evidence Presented on Future Damages

The Board argues that Wilkins failed to provide sufficient evidence of her future damages as included in Instruction No. 8 because there was sparse evidence of Wilkins's continuing emotional suffering and future economic loss. We disagree.

Actual damages under the MHRA in an employment-discrimination claim may include awards for emotional distress, humiliation, and suffering. Soto v. Costco Wholesale Corp., 502 S.W.3d 38, 54-55 (Mo. App. W.D. 2016). Such damages may be established at trial "by testimony or inferred from the circumstances." Id. at

55. Determining whether or not compensation is required for continuing emotional distress, suffering, and humiliation experienced is a case-specific inquiry and demands individualized contemplation. See id.

Viewing the facts surrounding Wilkins's evidence of continuing emotional suffering, we reject the Board's characterization of the evidence presented at trial as "sparse." Wilkins—an excellent teacher—was unlawfully and contrary to express Board policy terminated from her teaching position at her alma mater; a school that had made a significant and truly noteworthy contribution, not only to her career, but to her life's direction. At HSSU, Wilkins was able to shape future teachers, which became her purpose. Wilkins's sudden termination stripped her of this very meaningful and profound direction of her life. Shocked and devastated, Wilkins was bewildered and disheartened by the Board's consistent failure to articulate why she was selected for termination in contradiction of HSSU's express reduction-in-force policy. Wilkins was further perplexed by the Board's failure to identify the acts that constituted her purported misconduct. The record reveals Wilkins's struggle to relay her testimony at trial and to make sense of the Board's contradictory and questionable actions. Wilkins testified about her continuing disbelief of how she was treated by HSSU officials and administrators, and she explained that the evasiveness and clandestine actions of previously supportive and collegial administrators intensified her distress.

Wilkins described the disrespect and humiliation she felt as she was publicly marched off campus in the same manner as a former HSSU professor who had been fired and escorted from campus for lying about a previous child-molestation conviction. To Wilkins, HSSU, the school that

had been an integral and soulful part of her life, now treated her like a convicted felon, instead of according her the respect she had earned through nearly ten years of dedicated and excellent service.

Wilkins further elaborated on the emotional scars of allegations that she committed workplace misconduct. Wilkins felt that her professional reputation was tarnished. Wilkins was upset because she "knew, if they didn't change this, my career would be over." Wilkins further related that the acts of HSSU officials deprived her of a sense of accomplishment and her ability to feel as though she was contributing to the community.

The Board's argument that there was insufficient evidence of continued emotional suffering to support the jury instruction on future damages is unavailing and not supported by the record. The jury was in a superior position to observe Wilkins's testimony and gauge her credibility. While the jury was free to believe or disbelieve Wilkins's testimony regarding the continuing emotional impact of the wrongful termination on her life, there was sufficient evidence for a reasonable juror to conclude that Wilkins would experience ongoing emotional distress.

■ The Board also argues that Wilkins's evidence of future lost wages was too speculative to warrant relief. The Board contends that Wilkins's lack of interest in future employment in other schools and her decision not to apply for any subsequent teaching positions in St. Louis precluded her, as a matter of law, from seeking future damages. Specifically, the Board emphasized various open principal positions for which Wilkins did not apply.

■ Proof of future lost wages does not require expert testimony when it is based on plaintiff's own knowledge and is a

matter within the comprehension of the jury. Brenneke v. Dep't of Mo., 984 S.W.2d 134, 141 (Mo. App. W.D. 1998). The party discriminated against may testify about his or her own past wage loss and future employment prospects, if he or she can show a basis for this knowledge. Id. While there need not be exact certainty to the amount of future wages, Id. at 142, "the value of a loss of future earnings may not rest upon speculation." Haley v. Byers Transp. Co., 414 S.W.2d 777, 782 (Mo. banc 1967).

Here, Wilkins testified that she earned around $67,622 annually before her termination and that she planned to work, at a minimum, of ten to twelve more years. Wilkins said that she planned to work further—into her late seventies—as other faculty members employed at the university were that age. Wilkins received exceptionally positive employment reviews while employed at HSSU, including a positive evaluation immediately before her firing. The record is absolutely void of any evidence to suggest that Wilkins was unsuited for her position or that she was at risk of being lawfully terminated. Yet, after her termination for "inappropriate activities," Wilkins testified that her academic reputation was ruined, that HSSU placed a letter alleging misconduct into her employment file, and that she believed she could not receive the necessary recommendations for subsequent employment. Unexpectedly thrust into the job market, the record reflects that Wilkins was interested in, and searched for, similar teaching positions at colleges or universities in the area. However, Wilkins was unable to find such a job within commuting distance of St. Louis.

We are not persuaded that Wilkins's wage loss is too speculative to warrant relief. Wilkins's inability to acquire subsequent employment is relevant to the issue of her obligation to mitigate her damages,

but is not evidence that she failed to establish recoverable damages. See Hurst v. Kan. City, Mo. Sch. Dist., 437 S.W.3d 327, 336-37 (Mo. App. W.D. 2014).

In Hurst, the defendant school district asserted that the plaintiff, a school psychological examiner, failed to make a submissible case for damages under the MHRA because she refused an offer for a classroom teaching position. Id. at 331-32. The Western District rejected the defendant's claim that the plaintiff's decision to decline subsequent employment established that she had failed to make a submissible claim for damages. Id. at 336-37. Instead, the Western District found that the plaintiff's failure to mitigate damages by rejecting a comparable teaching position might offset the damages she could recover under the MHRA; it did not affect whether the plaintiff met the minimum threshold of proof required for instructing the jury on damages. Id.

Here, the trial court instructed the jury on Wilkins's duty to mitigate. The Board argued to the jury that Wilkins's decision not to apply for open positions as principal should reduce her damages. Wilkins countered that the open principal positions were not reasonably related to her former position at HSSU.[11] Ultimately, Wilkins's decision not to apply for subsequent employment as a school principal was a ques-

tion for the jury to weigh in light of Wilkins's duty to mitigate her damages. See id.

The trial court did not commit error by overruling the Board's objection and allowing the inclusion of the elective phrase "and is reasonably certain to sustain in the future" in Instruction No. 8. The inclusion of the elective phrase is supported by the evidence and circumstances of this case and properly allowed the jury to consider and award future damages. The Board's first point on appeal is denied.

## III. Point Two—Section 174.150

In its second point on appeal, the Board asserts that the trial court committed error by allowing Wilkins to explain and display a printed copy of a Missouri statute, Section 174.150, to the jury.[12] Section 174.150 describes the required format of removal or suspension proceedings for faculty members at state college and universities. Snowden v. Northwest Mo. State Univ., 624 S.W.2d 161, 164 n.1 (Mo. App. W.D. 1981). The Board reasons that the statute should not have been shown and explained to the jury because Wilkins did not seek relief under Section 174.150. The Board maintains that allowing the jurors to focus on Section 174.150.1 encouraged them to decide the case on an improper

11. ·Wilkins testified at trial that, compared to college or university instructors, principals generally work twice as many hours, experience significantly more stress, are on-call for school-related emergencies, are tasked with administering student discipline, must interact with parents of young students, and are required to complete significant amounts of paperwork.

12. Section 174.150 provides the following:
 1. No ... teacher shall be removed except for incompetency, neglect or refusal to perform his duties, dishonesty, drunkenness or immoral conduct; nor shall such ... teacher be removed until after ten days' notice,

in writing, stating the nature and cause of removal; and he shall have an opportunity to make a defense before the board by counsel or otherwise; and be allowed to introduce testimony which shall be heard and determined by the board.
 2. In every case of suspension or expulsion by the faculty the person suspended or expelled shall be allowed an appeal to the board from the decision of the faculty, and the board shall prescribe the manner and mode of proceeding in the matter of such appeal; but the decision of the board upon such appeal shall be final.

basis—the Board's alleged violation of Section 174.150.1—rather than on the Board's liability under the MHRA as instructed. We do not address the substance of this point on appeal because the Board failed to preserve this claim of error.

■ "To preserve an issue that evidence was improperly admitted, it is not enough for a party to rely solely on the ruling denying a motion in limine ... '[a] motion in limine, by itself, preserves nothing for appeal.'" Marquis Fin. Servs. of Ind. v. Peet, 365 S.W.3d 256, 260 (Mo. App. E.D. 2012) (quoting Hancock v. Shook, 100 S.W.3d 786, 802 (Mo. banc 2003)). After the denial of its motion in limine, a party "is required to object at trial to the introduction of the evidence and to reassert the objection in post-trial motions." Id. Where evidence is admitted without objection, "the party against whom it is offered waives any objection to the evidence, and it may be properly considered even if the evidence would have been excluded upon a proper objection." Host v. BNSF Ry. Co., 460 S.W.3d 87, 106 (Mo. App. W.D. 2015).

The record shows that the Board moved in limine to exclude the admission of Section 174.150. The trial court overruled the Board's motion. The Board did not ask for a continuing objection to the evidence. During the parties' pre-trial discussions on other motions in limine, the trial court warned the parties as to the temporary nature of his rulings by stating that

"things may happen during the trial that persuade me to do something different." The Board's motion in limine preserved nothing for appellate review. Marquis Fin. Servs. of Ind., 365 S.W.3d at 260.

During trial, Wilkins's counsel then read the deposition testimony of Ms. Hollingsworth. The deposition testimony included the text of the Section 174.150.1. Follow-up testimony established that the Board did not give Wilkins the process, notice, and hearing required by the statute. The Board contends that Wilkins's counsel then showed the text of the statute to the jury. The jury was able to view, read, and consider the statute in its entirety. Crucially, the Board neither objected to this testimony nor to the actions of Wilkins's counsel at that time. As a result, the evidence was properly before the jury. See Host, 460 S.W.3d at 106. By failing to raise an objection when the evidence was first offered and presented to the jury, the Board waived any challenge to the jury's consideration of Section 174.150.[13] See id. Accordingly, the Board failed to preserve any claim of error as to its arguments raised in Point Two. We decline plain-error review. The Board's Point Two is denied.

## IV. Point Three—Damage Remittitur of the Compensatory Award

### A. Standard of Review

■ We afford the trial court broad discretion in deciding whether remittitur should be ordered after a jury verdict.

---

**13.** The Board's recitation of the facts relating to the presentation of this evidence and the Board's objections is misleading at best. The Board suggests in its brief at page 20 that "it timely raised an objection to the statute being published and read to the jury on the grounds raised in [its] motion in limine." However, the Board did not object to the reading of Ms. Hollingsworth's deposition testimony, including those specific portions that addressed Section 174.150. It was not until three days after

Ms. Hollingsworth's testimony was presented to the jury that the Board objected on relevancy grounds during an exhibit conference to the admission of a copy of Section 174.150. At that point, the jury had already received deposition testimony, admitted *without* objection, about the requirements of Section 174.150 and heard that the Board failed to provide Wilkins with the required procedures outlined therein.

Blanks v. Fluor Corp., 450 S.W.3d 308, 407 (Mo. App. E.D. 2014). Accordingly, we review the trial court's decision for abuse of that discretion. Id. at 408. We are hesitant to interfere with a jury verdict unless it is manifestly unjust. Dieser v. St. Anthony's Med. Ctr., 498 S.W.3d 419, 440 (Mo. banc 2016). In reviewing the evidence to determine if the award was manifestly unjust, we do so in the light most favorable to the verdict, and we disregard any contrary evidence. Id.

B. No Abuse of Discretion

In its third point on appeal, the Board challenges the jury award of $1,350,000 for compensatory damages as grossly excessive because: (1) there was evidence that Wilkins would have only worked at HSSU for ten more years; (2) there was "sparse" evidence of future damages; (3) Wilkins never applied for another job; and (4) Wilkins testified that she was not working at HSSU for the money. Accordingly, the Board charges the trial court with abusing its discretion in failing to remit the compensatory-damage award. We find no abuse of discretion.

Section 537.068 permits a court to enter a remittitur order reducing the jury's verdict if the court finds that the jury's verdict exceeds the fair and reasonable compensation for plaintiff's injuries and damages. Stewart v. Partamian, 465 S.W.3d 51, 59 (Mo. banc 2015). The purpose of the remittitur procedure is "to correct a jury's honest mistake in fixing damages," rather than to correct juror bias and prejudice. Id. (quoting Massman Constr. Co. v. Mo. Highway & Transp. Comm'n, 914 S.W.2d 801, 803 (Mo. banc 1996)). A prerequisite to remittitur is that the moving party demonstrates that "good cause warrants a new trial on damages or the verdict is against the weight of the evidence." Badahman v. Catering St. Louis, 395 S.W.3d 29, 35 (Mo. banc 2013).

"[T]o warrant remittitur or new trial due to excess, the size of the verdict must be so grossly excessive as to shock the conscience because it is glaringly unwarranted." Soto, 502 S.W.3d at 54 (quoting Mackey v. Smith, 438 S.W.3d 465, 480 (Mo. App. W.D. 2014)). Each MHRA case requires individualized contemplation and consideration by the trier of fact. See id. Fair and reasonable compensation is the ultimate goal in awarding damages. Van Den Berk v. Mo. Comm'n on Human Rights, 26 S.W.3d 406, 414 (Mo. App. E.D. 2000). In evaluating the reasonableness of a verdict, courts often consider the following factors: "(1) loss of present and future income; (2) medical expenses; (3) plaintiff's age; (4) the nature and extent of plaintiff's injuries; (5) economic considerations; (6) awards approved in comparable cases; and (7) the trial court's and jury's superior opportunity to evaluate plaintiff's injuries and other damages." Hurst, 437 S.W.3d at 338-39.

The Board first argues that Wilkins testified that she would only work ten more years, and thus compensation for her purported damages would not exceed $670,000 (10 years x 67,000 in annual salary). The Board either misunderstands or ignores our standard of review, which mandates that we view the evidence in the light *most favorable to the jury's verdict.* Dieser, 498 S.W.3d at 440. At trial, Wilkins testified that she would have worked for ten to twelve more years at a *minimum.* Wilkins further testified that she desired to work even longer, and possibly into her late seventies, as others on HSSU's campus often did. Teaching into her late seventies would take Wilkins well beyond the ten or twelve additional years that she was planning, at a minimum, to work at HSSU. The jury reasonably could have credited Wilkins's testimony that she desired to work into her late seventies.

Next, the Board argues that there was sparse evidence of future emotional damages and that Wilkins failed, as a matter of law, to prove her damages because she did not establish that she applied for subsequent employment. We have already fully addressed and rejected the Board's argument regarding the sufficiency of evidence for these damages in Point One. See, e.g., City of Harrisonville v. McCall Serv. Stations, 495 S.W.3d 738, 749 (Mo. banc 2016). The record contains substantial evidence of future damages for the jury to consider, and the record supports the jury's award.

Finally, the Board argues that the jury's award was grossly excessive because Wilkins was working at HSSU primarily to help instruct future teachers, rather than for the monetary reward. We reject the Board's contention that, because Wilkins was deeply motivated to work at HSSU to shape and guide future educators, she somehow is not entitled to damages as a result of the Board's discriminatory and unlawful conduct. We instead find that Wilkins's termination—from a position that was a significant component of her life—increased her intangible damages and did not limit the recovery of her economic losses.

■ A monetary award under the MHRA may be based, in part, on certain intangibles that are not easily calculable. See Soto, 502 S.W.3d at 54. These intangibles include, among other things, future pain, future suffering, loss of self-worth, loss of self-esteem, embarrassment, humiliation, and emotional distress. See id. at 54-55. Damages may be established by testimony or inferred from the circumstances. Van Den Berk, 26 S.W.3d at 413.

Here, Wilkins's testimony clearly established that the loss of her teaching position at HSSU devastated her. The fact that Wilkins was deeply motivated to work at HSSU only increased her emotional distress after her termination. Impermissibly terminated from a position and a place that she cherished, the Board deprived Wilkins of the ability to shape future educators at her alma mater with the result that Wilkins no longer felt as though she was contributing or giving back to her community. Wilkins's firing from this particular position caused her to lose self-esteem, self-worth, and a sense of accomplishment. Further, the manner in which the Board and HSSU officials fired Wilkins only amplified her personal distress. HSSU, the school that mattered so much to Wilkins, treated her similarly to that of a convicted felon, instead of providing her with the respect warranted by years of dedicated and excellent service. The record shows recoverable intangible damages even if Wilkins's primary motivation to work at HSSU was not economic compensation.

We further find no merit in the Board's contention that, because HSSU was Wilkins's alma mater and that she valued giving back to the school, she somehow had no interest in receiving regular compensation or in acquiring subsequent employment. Viewing the evidence in the light most favorable to the jury's verdict, Dieser, 498 S.W.3d at 440, we find sufficient evidence to the contrary.

Wilkins testified that she had received and accepted annual salary and benefits for her regular classes as well as additional compensation for her summer-teaching assignments. Although Wilkins testified that she enjoyed giving back to her school and that her primary motivation for teaching was to help future teachers, the record reflects that Wilkins received compensation for her employment and that her annual salary and benefits was a factor for her decision to continue teaching. Wilkins maintained a limited, part-time position teaching at a community college after her

termination, and Wilkins actively searched for full-time comparable employment at other colleges and universities. Thus, the evidence supports a finding that Wilkins was willing to work at other institutions for compensation and that she was not working at HSSU *only* to give back to the school. Wilkins's unsuccessful search to obtain full-time employment is not definitive proof that Wilkins lacked any desire to continue teaching, but instead is evidence, which the jury considered, of whether Wilkins reasonably mitigated her damages. See Hurst, 437 S.W.3d at 337-38.

Wilkins derived significant happiness, as well as regular and significant compensation, from teaching at HSSU until her unlawful termination. Wilkins is entitled to full compensation for such losses. The trial court did not abuse its discretion in refusing to remit the jury's award for compensatory damages. Accordingly, Point Three is denied.

## V. Point Four—Submitting Punitive Damages to the Jury

■■ In Point Four, the Board asserts that the "trial court erred in allowing the issue of punitive damages to be submitted to the jury because there not substantial evidence that [the Board] acted with evil motive or reckless indifference...."[14] Again, before we examine the merits of the Board's point, we first address Wilkins's response that the Board waived its challenge to the submissibility of punitive damages when it did not move for a directed verdict at the close of all the evidence on this issue.

Important to our resolution of this point on appeal, the Board did not assert a claim

at trial that Wilkins failed to make a submissible case for punitive damages. Neither its motion for directed verdict at the close of plaintiff's evidence nor at the close of all evidence raises the issue of submissibility. At the instruction conference, the Board for the first time raised the issue of submissibility as to punitive damages when it objected to Wilkins's proposed jury instruction claiming that Wilkins failed to make a submissible case for punitive damages. The trial court overruled the Board's objections and instructed the jury on punitive damages. In its post-trial motions, the Board argued that Wilkins's evidence was insufficient to warrant submitting the punitive-damages instruction to the jury.

Rather than contending that an instruction was improperly modified under the facts of the case, as it did in Point One, the Board here directly asserts that Wilkins failed to make a submissible case for damages. The Board did not preserve this claim of error for appellate review because the Board did not raise this issue before the trial court in its motion for directed verdict.

Rule 72.01 permits a party to move for a directed verdict at the close of the opponent's evidence or at the close of all evidence. Sanders v. Ahmed, 364 S.W.3d 195, 206-07 (Mo. banc 2012). The framework delineated in Rule 72.01 effectively describes "the procedure for challenging the submissibility of plaintiff's case." Id. at 207. Indeed, the "purpose of motions for directed verdict and JNOV is to 'challenge the submissibility of the plaintiff's case.'" Bailey v. Hawthorn Bank, 382 S.W.3d 84, 99 (Mo. App. W.D. 2012) (quoting Marquis

---

14. The MHRA authorizes an award for punitive damages when the claimant demonstrates "clear and convincing proof of a culpable mental state, either from a wanton, willful, or outrageous act, or from reckless disregard for an act's consequences such that an evil motive may be inferred." McGhee v. Schreiber Foods, Inc., 502 S.W.3d 658, 673 (Mo. App. W.D. 2016) (quoting Hill v. City of St. Louis, 371 S.W.3d 66, 71 (Mo. App. E.D. 2012)).

Fin. Servs. of Indiana, Inc., 365 S.W.3d at 259).

 "To preserve the question of submissibility for appellate review in a jury-tried case, a motion for directed verdict must be filed at the close of all the evidence and, in the event of an adverse verdict, an after-trial motion ... must assign as error the trial court's failure to have directed such a verdict." Pope v. Pope, 179 S.W.3d 442, 451 (Mo. App. W.D. 2005) (quoting Letz v. Turbomeca Engine Corp., 975 S.W.2d 155, 163 (Mo. App. W.D. 1997), overruled on other grounds in Badahman, 395 S.W.3d at 40). Accordingly, the failure to move for a directed verdict at the close of all the evidence waives any contention that plaintiff failed to prove a submissible case. Letz, 975 S.W.2d at 163. The submissibility of plaintiff's case for punitive damages is contestable by a motion for directed verdict on the issue. See Johnson v. Allstate Indem. Co., 278 S.W.3d 228, 234 (Mo. App. E.D. 2009).

To challenge on appeal the submissibility of plaintiff's claim, the defendant must utilize the framework of Rule 72.01. See Sanders, 364 S.W.3d at 206-07. Here, the Board did not argue in its motion for directed verdict that Wilkins's punitive-damage claim was not submissible. The Board's failure to challenge the submissibility of a claim in a motion for a directed verdict before the trial court does not preserve said challenge for appellate review. Significantly, such failure cannot be cured by the inclusion of the issue in post-trial motions. See Johnson, 278 S.W.3d at 234.

We find Walsh v. City of Kansas City instructive.[15] In Walsh, the defendant did not assert that the claimant lacked a submissible case for punitive damages in its motion for a directed verdict at the close of all the evidence. 481 S.W.3d at 113. However, as here, the defendant objected to the punitive-damages jury instruction, arguing that the claimant did not present sufficient evidence warranting a submission of a punitive-damage instruction to the jury. Id. at 104. Holding that the defendant waived its challenge to the submissibility of punitive damages, the Walsh court concluded that the exclusive procedure to attack the submissibility of punitive damages was through a motion for a directed verdict under the framework provided by Rule 72.01(a)-(b). Id. at 112. The failure to raise and argue against the submissibility of punitive damages in the defendant's motion for directed verdict did not preserve the point for the appeal. Id. at 113.

Similarly, we find that the Board has failed to preserve for our review its assertion that Wilkins did not make a submissible claim for punitive damages. See id.; Johnson, 278 S.W.3d at 234. By not raising the issue in either of the Board's motion for directed verdicts, the Board failed to preserve this issue for appellate review. The Board does not request, and we decline to provide, plain-error review of the Board's point. Point Four is denied.

## VI. Punitive-Damages Remittitur

 The Board next attacks the punitive damages award with its contention that the award of $3,500,000 as punitive damages violated its due process rights. The Board posits that the award was grossly excessive in light of the nature of its conduct and the harm suffered by Wilkins, requiring remittitur by the trial

15. In its reply brief, the Board argues that Walsh was decided after Wilkins's trial. Even though Walsh was decided after Wilkins's trial, we find no reason to depart from its reasoning and are unable to find a principled distinction between the cases to warrant deviating from the analysis applied in Walsh.

court.[16] The Board characterizes its conduct as, at most, general incompetence by administrators who were not prepared to handle the reduction in state funding. We are not persuaded.

The 14th Amendment to the United States Constitution and Article I, Section 10 of the Missouri Constitution prevent the deprivation of its life, liberty, or property, without due process of law. Estate of Overbey v. Chad Franklin Nat'l Auto Sales North, LLC, 361 S.W.3d 364, 372 (Mo. banc 2012); Fleshner v. Pepose Vision Inst., P.C., 304 S.W.3d 81, 87 (Mo. banc 2010). The award of punitive damages must meet the requirements of due process and comply with a state's legitimate interest in punishing unlawful conduct and deterring repetition of harmful conduct. State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 416, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). Due process prohibits "the imposition of grossly excessive or arbitrary punishments on a tortfeasor" because to "the extent an award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property." Id. at 416-17, 123 S.Ct. 1513. Accordingly, punitive-damage awards that are grossly excessive violate a tortfeasor's substantive right of due process. Id. at 417, 123 S.Ct. 1513.

In determining whether an award is "grossly excessive" as to violate due process rights, we generally consider the following factors: "(1) the degree of reprehensibility of the conduct at issue; (2) the ratio of actual harm to punitive damages; and (3) the difference between the punitive damage award and the civil penalties authorized or imposed in comparable

cases." Diaz v. AutoZoners, LLC, 484 S.W.3d 64, 90 (Mo. App. W.D. 2015) (quoting BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 575, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)). In MHRA cases, the third factor—the comparative penalties between comparable cases—is inconsequential. Id.

The degree of reprehensibility of defendant's conduct is the most important indicium of the reasonableness of a punitive-damage award. Blanks, 450 S.W.3d at 410. In evaluating the reprehensibility of defendant's conduct, we consider whether:

> [T]he harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

Estate of Overbey, 361 S.W.3d at 373 (quoting State Farm, 538 U.S. at 419, 123 S.Ct. 1513).

Here, the Board argues that its conduct was not sufficiently reprehensible to justify the punitive-damage award because Wilkins's harm was not physical and there was no evidence of Wilkins's financial vulnerability. While Wilkins suffered no physical harm, the Board, once again, grossly minimizes and understates the damages suffered by Wilkins. The record supports a jury finding that Wilkins experienced substantial emotional and psychological damage, in addition to the damage to her reputation in the academic field and to her

---

**16.** Wilkins claims that the Board does not have any constitutional rights under the due process clause, citing State ex rel. Brentwood School Dist. v. State Tax Comm'n, 589 S.W.2d 613, 615 (Mo. banc 1979). We need not address this contention, because the Board's rights, if any, were clearly not violated by the trial court's refusal to remit the punitive-damage award.

ability to earn income. Wilkins was humiliated throughout the process of her termination and firing and was deprived of one of the most important touchstones of her life—the ability to shape and guide future educators.

The Board also blatantly, repeatedly, and systematically ignored Wilkins's rights in the process of firing her and terminating her contract. The Board sanctioned a process, engaged in by the Teacher Education Department, to make said department "blacker" at the expense of Wilkins's rights. In a time where claims of discrimination are most often proven through circumstantial evidence due to the covert and subtle nature of discriminatory conduct, this case stands apart. Rarely have we seen such manifest and open evidence of racial discrimination. Moreover, the Board not only decided to terminate Wilkins from her regular employment at HSSU due to her race, but it greatly exacerbated the damage by then firing Wilkins from her summer employment in retaliation for exercising her lawful right to assert a claim of race-discrimination. In so doing, the Board reported that Wilkins had committed "inappropriate activities." This additional wrongful act added to Wilkins's damages by tarnishing her professional reputation and hindering her ability to find suitable work, while obscuring the role Wilkins's race played in the Board's decision to terminate her employment.

Further, the conduct of the Board, by deleting the email account of Dr. Smith, as well as blatantly disregarding HSSU's own policies, allowed a reasonable fact-finder to draw the inference that the harm caused to Wilkins was the result of intentional malice, trickery, or deceit—as opposed to a mere accident or inexperience as argued by the Board. We firmly hold that the evidence of reprehensibility of the Board's conduct weighs strongly in favor of the punitive damages awarded in this case.

■ The next factor for this Court to consider is the ratio of actual harm to punitive damages. The United States Supreme Court "has been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award." State Farm, 538 U.S. at 424, 123 S.Ct. 1513. No "rigid benchmarks" or "mathematical formulas" exist, and we must consider the precise award based on the "peculiar facts and circumstances of the defendant's conduct and the harm to the plaintiff." Blanks, 450 S.W.3d at 411 (citing State Farm, 538 U.S. at 424-25, 123 S.Ct. 1513). While no precise formula was established, the Supreme Court nevertheless held that an award of a single-digit ratio would be more likely to comport with due process requirements and still achieve the state's goals of deterrence and retribution. State Farm, 538 U.S. at 425, 123 S.Ct. 1513.

Here, the jury awarded $1,350,000 in compensatory damages and $3,500,000 in punitive damages. The ratio of punitive damages to compensatory damages awarded by the jury is slightly less than triple. A three-to-one ratio of punitive damages to compensatory damages is well-within the range established by constitutional jurisprudence. See id. Further, double and treble punitive damages are often found to be compatible with constitutional rights, as statutory punishment often provides for sanctions of double, treble, or quadruple damages to deter harmful conduct and punish transgressors. Id. We have no reason to determine that the award of $3,500,000 in punitive damages violates the Board's purported due process rights.

The Board unlawfully terminated Wilkins, not due to her competency or ability, but because of the color of her skin. The

evidence strongly supports a finding that the Board then punitively and abruptly fired Wilkins from her summer-teaching position because she challenged her termination as race discrimination. This conduct by the Board certainly could be viewed by the jury as malicious, heinous, and deserving of punitive damages. The ratio of punitive damages awarded in this case does not transgress the requirements imposed by our State and Federal Constitutions. Accordingly, the trial court did not err in rejecting the Board's claim for remittitur. Point Five is denied.

## VII. Attorney's Fees on Appeal

Finally, we consider Wilkins's motion for attorney's fees and costs on appeal. Section 213.111.2 of the MHRA authorizes the court to award court costs and reasonable attorney's fees to a prevailing party. Walsh, 481 S.W.3d at 115. "A 'prevailing party' includes one who prevails in an action brought under the MHRA, is awarded attorney fees by the trial court, and who successful defends that favorable judgement on appeal." Id. Where the plaintiff has prevailed under the MHRA, the court should award attorney's fees "unless special circumstances would render such an award unjust." McCrainey v. Kan. City Mo. Sch. Dist., 337 S.W.3d 746, 756 (Mo. App. W.D. 2011). Here, we affirmed Wilkins's claims for punitive and compensatory damages under the MHRA. Wilkins also recovered her attorney's fees and costs before the trial court. Therefore, Wilkins is the prevailing party as defined in Section 213.111.2. Walsh, 481 S.W.3d at 115. We see no special circumstances that would render an award of attorney's fees and costs unjust. Accordingly, we grant Wilkins's motion.

Finding Wilkins entitled to her attorney fees, we can either fix the amount of attorney's fees and costs on appeal or remand to the trial court to determine the reasonableness of the fees and costs requested. McCrainey, 337 S.W.3d at 756. While we acknowledge that trial courts are generally in a better position to take evidence and hear argument relating to attorney's fees, we also have expertise on the subject of appellate attorney's fees and have the authority to enter an appropriate award. Ellison v. O'Reilly Auto. Stores, Inc., 463 S.W.3d 426, 442 n.2 (Mo. App. W.D. 2015). The parties here do not dispute the propriety of awarding attorney's fees or the reasonableness of the rate requested. Instead, the Board challenges the reasonableness of some of the work performed by Wilkins's counsel for which fees were requested. Specifically, the Board asserts that Wilkins invited any additional research and work on the finality-of-judgment issue by not dismissing HSSU as Wilkins's counsel had indicated, and that Wilkins failed to timely and reasonably prepare her filed deposition exhibits on appeal. The Board's challenges to the reasonableness of a portion of Wilkins's request for attorney's fees have merit. Seeing no reason to remand for a hearing on the issue of attorney fees and to promote judicial efficiency, we grant Wilkins's motion for attorney's fees and costs on appeal in the amount of $35,602.56.

## Conclusion

The judgment of the trial court is affirmed. We grant Wilkins's motion for attorney's fees and costs in the amount of $35,602.56.

James M. Dowd, P.J., concurs.

Gary M. Gaertner, Jr., J., concurs.