DON E. BURRELL, J.
Carroll Electric Cooperative Corporation ("Carroll Electric") appeals a judgment[1] in favor of Steven M. Bare and Suzanne M. Bare, Co-Trustees of the Steven M. Bare and Suzanne M. Bare Joint Revocable Trust Agreement Dated January 12, 2005 ("Landowner"), for common-law trespass in connection with the manner and extent of the clearing of a right-of-way easement Carroll Electric acquired from Landowner.[2] The judgment awarded Landowner $12,224.47 in actual damages (plus court costs), $75,000 in punitive damages, and $59,455.55 in attorney fees.
The judgment also awarded actual damages and court costs (but not punitive damages) in favor of Landowner against a second defendant, Seven Valleys Construction Company ("Seven Valleys"), the entity Carroll Electric retained to clear the right-of-way and pile the resulting severed trees and brush on Landowner's land.[3] Landowner claimed, inter alia , that Seven Valleys acted as Carroll Electric's agent in trespassing beyond the right-of-way they ceded to Carroll Electric and that the conduct of both defendants was "outrageous" due to "evil motive or reckless indifference to the rights of others."
Carroll Electric's first two points claim the trial court erred in denying Carroll Electric's motions for directed verdict[4] *40 and judgment notwithstanding the verdict, or alternatively, a new trial ("JNOV motion"), because Landowner failed to make a submissible case that: (1) Seven Valleys was an agent of Carroll Electric in that there was no substantial evidence "that Carroll Electric controlled or had the right to control the physical conduct of Seven Valleys in the clearing of the" right-of-way; and (2) Landowner's "evidence failed to identify any conduct of Carroll Electric that was outrageous or reckless[.]" Point 2 also claims the trial court erred as a matter of law in submitting punitive damages to the jury "based upon the conduct of employees of Seven Valleys[.]"
Point 3 claims "[t]he trial court erred by giving Instruction No. 15[,] submitting the issue of punitive damages" ("the punitive damages verdict director"), when "there was no substantial evidence that" Carroll Electric's conduct was outrageous due to an "evil motive or reckless indifference to the rights of others." Point 4 claims the trial court erred in denying "Carroll Electric's motion for remittitur [ ("the remittitur motion") ] to set aside the punitive damage award ... in its entirety" because "the jury did not find Seven Valleys liable for punitive damages" and the "entire theory of liability against Carroll Electric was based upon respondeat superior liability[.]"
Point 5 challenges the judgment's award of attorney fees to Landowner on the ground that section 523.283.4[5] does not allow such fees in cases of common law trespass and Landowner did not claim that there had been an " 'expanded use' as defined by that statute." Finally, Point 6 presents the alternative claim that if the punitive damages award is not otherwise set aside, the trial court abused its discretion in denying the remittitur motion because the amount of the award ($75,000) is excessive based upon the totality of the surrounding circumstances and thereby violated Carroll Electric's due-process rights.
Finding no merit in any of Carroll Electric's points, we affirm the judgment. We also grant in part Landowner's "MOTION FOR ATTORNEY'S FEES ON APPEAL " ("attorney fees motion"), and the matter is remanded to the trial court to enter such an award.
*41 The Relevant Evidence
Before the easement was executed, Landowner met with representatives from Carroll Electric on a few occasions, and their discussions included what would happen to the trees and brush cleared from the right-of-way and whether Carroll Electric would need to go beyond the boundaries of the right-of-way in clearing trees. The easement "granted to [Carroll Electric] the perpetual right to clear and keep clear" the right-of-way, and it also permitted the removal of trees and "all other obstacles outside of the [right-of-way] that are tall enough to strike the transmission line[.]"
Landowner was concerned that this language seemed vague, and Carroll Electric's field service supervisor, Michael Allen,[6] told Landowner that the language was in the easement so that Carroll Electric could " 'take danger trees[.]' " Mrs. Bare asked if Carroll Electric "would just take that [danger tree provision] out since it was so vague[.]" Representatives from Carroll Electric "said no, but they said, " 'You have nothing to worry about.' " Carroll Electric's design engineer, Bryce Barton, had walked the portions of the right-of-way where the trees were located and the lay-of-the-land was visible. Both Mr. Barton and Mr. Allen "assured [Landowner] that they could do the project in 100 feet" (the width of the right-of-way). Mr. Allen indicated that there would be no exception requiring the right-of-way to be wider than 100 feet. Mr. Allen told Landowner that Carroll Electric would only need to go beyond the right-of-way "in case of an emergency, an ice-storm-type situation[.]"
Mr. Allen also said that if damage occurred to Landowner's property outside of the right-of-way, then Landowner should "make a written claim to Carroll Electric and they would take care of restoring or repairing the damage." Mrs. Bare testified that she would not have signed the "Agreement for Compensation" ("the easement contract") if these promises had not been made by Carroll Electric.
The easement contract did not address where the trees and brush cleared from the right-of-way would be placed. Mr. Allen told Landowner that Carroll Electric would " 'just leave the timber on the edge of our right-of[-]way.' " Landowner clarified that this meant that the cleared trees and brush would be " '[o]n the edge of your right-of-way, not the edge of our [Landowner's] land?' and [Mr. Allen] said, 'Yes[.]' "
The easement contract consisted of a single page. It guaranteed payment of $9,060 to Landowner for the easement, and it included typewritten language at the bottom of the page: "Note: Logs shall be left on the edge of right-of-way for landowner" ("the typed-note").[7] Mrs. Bare recalled *42 that someone from Carroll Electric said that the typed-note "satisfied what we had discussed about [the cleared trees and brush] being left on the edge of" the right-of-way.
In September 2010, Landowner executed the easement contract. The version of the easement contract introduced at trial contained a hand-written note that stated: " 'Brush also to be left pushed off edge of right-of-way.' " Mrs. Bare did not recognize the handwriting, and she was sure that the hand-written note was not on the easement contract when she signed it. If it had been, she would have "done something about it" when she was about to sign it. Mr. Allen testified that he had added the hand-written note to the easement contract.[8]
Carroll Electric also had a contract with Seven Valleys ("the Seven Valleys contract") for clearing the right-of-way and certain areas of other parties' lands to make way for the electric transmission line ("the project"). The Seven Valleys contract stated that Seven Valleys would "perform the work as an independent contractor, not as a subcontractor, agent, or employee of [Carroll Electric,]" but it also reserved to Carroll Electric "the right to require the removal from the project of any employee of [Seven Valleys] if in the judgment of [Carroll Electric] such removal shall be necessary in order to protect the interest of [Carroll Electric]." It also compelled Seven Valleys to increase the number of its employees on the project. Carroll Electric could also require Seven Valleys to increase or change its tools or equipment.
The engineer employed by Carroll Electric ("the engineer") was the authority to "designate all danger trees which shall be removed or topped at option of [Carroll Electric]." Seven Valleys could "not suspend work [pursuant to the recommendation of the engineer] without written authority from [Carroll Electric to do so]." Carroll Electric was entitled to Seven Valleys' records and other information concerning the project and Seven Valleys.
Mr. Allen inspected Seven Valleys' work on the project. Mr. Allen "had the ability to correct [Seven Valleys'] work if it was being done incorrectly," and he could talk to Seven Valleys' foreman if there was a problem. Mr. Allen could stop something like "putting logs off of the right-of-way" if he "felt that was wrong[.]" As he inspected the clearing work, he made "sure [that] they wasn't [sic] leaving stumps real high, making sure they was [sic] cutting it to the width. If there was [sic] any danger trees, [he] made sure they ... was [sic] getting them, making sure they was [sic], you know, following what we would want."
Portions of deposition testimony given by the president of Seven Valleys, Robert D. Ennes, were read to the jury. Mr. Ennes said that the project was about 10 miles long, and there was never a "reason *43 or occasion for [Seven Valleys] to go-for [its] crew to go outside the 100-foot easement[.]" Inspectors from Carroll Electric "made sure [Seven Valleys] was in the right place" and oversaw the "daily progress" on the project. It was Carroll Electric's "job" to determine whether there were any danger trees that should be removed by Seven Valleys.
Carroll Electric's supervisor could tell Seven Valleys' supervisor, Gary Hendrix, not to chop down a particular tree, and Mr. Ennes felt that employees of Seven Valleys were "under the control of" the Carroll Electric supervisor. Mr. Ennes was never on Landowner's property while the clearing work was being performed. Seven Valleys tried to accommodate Landowner in where they placed the cleared trees and brush, but if it was up to Mr. Ennes, he "would probably put them on the right-of-way on the edge" because he would not "want to get off the right-of-way."
Mr. Hendrix recalled that he spoke with Mr. Allen "every day or every other day" during work on the project. Before Seven Valleys began clearing the right-of-way, but while they were clearing part of a neighboring property, Mr. Hendrix told Mr. Bare that Seven Valleys would not be clearing anything wider than 100 feet across Landowner's property. As the clearing work got closer to Landowner's property, Mr. Bare again asked Mr. Hendrix "if we were still good for the 100 foot wide all the way through my property and not any wider anywhere." Mr. Hendrix replied "no," and that Mr. "Allen had told him to take mature trees 20 foot wide on each side of the north and the south boundary." Mr. Bare asked Mr. Hendrix for "the definition of a mature tree[,]" and Mr. Hendrix could not define it.
Mr. Bare told Mr. Hendrix "not to clear anything wider than 100 feet" and said he would provide a copy of the easement to Mr. Hendrix. Mr. Hendrix stated, " 'Well, we don't work off easements.' " Mr. Bare provided a copy of the easement to Mr. Hendrix. Mr. Hendrix said he would discuss the situation with Seven Valleys' owner. Mr. Hendrix reported the next day that he spoke with Seven Valleys' "owner[,]" and they "would not be clearing wider than 100 feet anywhere on [Landowner's] property."
Mr. Bare also told Mr. Allen that he did not want Carroll Electric "to clear anything outside the 100-feet easement that [they] had agreed to[.]" Mr. Bare recalled that Mr. Allen responded that he "had a signed easement and that he would take any tree on [Landowner's] place that [Mr. Allen] wished."
By March 2011, Seven Valleys had begun clearing the right-of-way. On March 3, 2011, Landowner met with Mr. Allen and a trimming crew supervisor for Carroll Electric. The trimming crew supervisor said that after the line was installed, "but before it was energized, he would" notify Landowner of any tree that could hit the line and they would try to trim and save the tree if possible. Landowner's telephone number was on the work plans. Mr. Allen said that they would mark such danger trees with red ribbons. Mr. Bare checked on the progress of the clearing most of the days that the crew worked on the right-of-way, and he looked for red ribbons. Some trees were marked with red ribbons as "danger trees" but "[t]hey were never taken out[,] and at some point the ribbons were removed."
Mr. Hendrix believed that the "brush and cut timber" from the right-of-way "had to go off the right-of-way," and "[s]omehow or another" he received information that he was to stack the trees and brush on Landowner's property. The cleared trees and brush were placed outside of the right-of-way on Landowner's *44 property. Mr. Hendrix believed that Seven Valleys could not "collect their money if the right-of-way [was] not clear." Mr. Bare saw that trees and logs cleared from the right-of-way were being placed outside of the right-of-way. Mr. Bare thought that this may have been necessary "to facilitate them being able to clear the hundred feet[,]" but he also thought that the crew would later "bring the logs back on where they agreed to put them."
On March 24, 2011, "the clearing crew [was] already past [Landowner's] property and [on to a neighbor's] property" when the Bares went on a trip. When they returned three days later, they discovered "a large area that had been bulldozed clear" on what had been a "fully wooded" area of the southeast corner of their property, and it extended into the neighbor's property. Landowner determined that 46 trees had been bulldozed in this area. Two stumps had been left in the ground, the corner post of a fence was broken, and the wire fencing was disconnected from the post. A "silt fence" had also been installed.
Over the next two days, Mr. Bare tried unsuccessfully to reach Mr. Allen and another supervisor at Carroll Electric. Mr. Hendrix told Mr. Bare that Mr. "Allen had provided [Mr. Hendrix] with a plan that had that new area bulldozed, cleared out." Mr. Hendrix "acted a little sheepish[,]" and he would not show Mr. Bare a copy of the plan. Mr. Bare called the sheriff's office.
Mr. Allen came out to Landowner's property and said he would have the silt fence removed. Mr. Allen would not show Mr. Bare the plan that Mr. Allen said called for the area to be bulldozed. Mr. Allen said he would deliver Mr. Bare's demand that the cleared area be reforested to the appropriate people within Carroll Electric. Another Carroll Electric supervisor told Mr. Bare to send his letter documenting the damage to the supervisor, but Mr. Bare "never received a response from anyone within Carroll Electric or representing them."
Mr. Bare learned in January 2012 from a "cleanup" contractor for Carroll Electric that the piles of trees and lumber would not be moved back onto the right-of-way. That same month, Mr. Bare also discovered that some of the piles of cleared trees had been placed on top of Landowner's fence that ran along the south boundary of its property, damaging that fence. At the end of March 2012, Mr. Bare discovered that other trees outside the boundary of the easement had been cut. The parties presented competing evidence regarding the amount of damages suffered by Landowner.
Landowner's neighbor, Dennis Melancon, testified that he and his wife executed an easement with Carroll Electric ("the Melancon easement") that allowed Carroll Electric to clear a 100-wide strip of the Melancon's property ("the Melancon right-of-way") in furtherance of the project. Fourteen trees tied with orange ribbons were cut down outside the Melancon right-of-way. When the Melancon easement was executed, Carroll Electric told the Melancons that they would be notified about danger trees. Despite that assurance, Carroll Electric had not notified the Melancons about the trees that were cut down outside the Melancon right-of-way. Additional trees "tagged" the same way had not been cut down, and Ms. Melancon "tried to file a complaint" with Carroll Electric. The Melancons also hired a lawyer to ask Carroll Electric to stop taking down trees located outside the Melancon right-of-way. After the Melancon's lawyer contacted Carroll Electric, no other trees, including the remaining tagged trees, were taken down.
*45 Post-Evidence Proceedings in Liability Phase
At the close of Landowner's evidence on liability, counsel for Carroll Electric presented the directed verdict motion, which claimed, first, on "[t]he issue of punitive damages[,]" that "Carroll Electric did not enter upon [Landowner's] property with evil motive or reckless difference [sic] to the rights of [Landowner]" as "Carroll Electric did not cut any trees or timber on [Landowner's] land inside or outside the easement granted." Second, "on the vicarious liability of Carroll Electric for the actions of Seven Valleys[,]" Carroll Electric asserted that the evidence was that Seven Valleys "was an independent contractor ... and not an agent or servant" and "[r]espondeat superior is inapplicable unless a master/servant relationship exists." Carroll Electric maintained that "the evidence in this case has demonstrated that [Seven Valleys] was not controlled by Carroll Electric in the performance of its work under the [Seven Valleys] contract." The trial court denied the directed verdict motion.
Carroll Electric then presented evidence on the issue of liability, and the parties rested. Carroll Electric renewed the directed verdict motion, and the trial court again denied the motion.
Regarding jury instructions, Carroll Electric was granted "a continuing objection throughout the instruction packet" to all instructions "to the extent that [they submit] the issue of punitive damage being assessed against [Carroll Electric] for the basis that there's insufficient evidence in the record to support a submission of punitive damages to the jury[.]" Concerning the "instruction on the scope and course of agency[,]" Instruction No. 10 ("the agency instruction"), counsel for Carroll Electric stated that there was "no objection to this instruction[.]" The agency instruction stated:
Clearing of the [right-of-way] was within the "scope and course of agency" as that phrase is used in these instructions if:
First, the clearing of the [right-of-way] was performed by [Seven Valleys] to serve the business interest of [Carroll Electric] according to an express or implied agreement with [Carroll Electric]; and
Second, [Carroll Electric] either controlled or had the right to control the physical conduct of [Seven Valleys].
Carroll Electric did object to the punitive damages verdict director on the ground that there was "insufficient evidence in the record to sustain a submission of punitive damages against" it. The punitive damages verdict director was predicated upon the jury finding Carroll Electric liable for trespass by Seven Valleys as Carroll Electric's agent and finding that "the conduct of [Carroll Electric] as set forth in the evidence was outrageous because of [Carroll Electric's] evil motive or reckless indifference to the rights of others[.]"
The jury returned "Verdict A[,]" finding that: (1) Landowner proved their claim against Seven Valleys for trespass; (2) Carroll Electric was responsible for Seven Valleys' trespass; (3) Landowner suffered damages in the amount of $6,560; (4) Seven Valleys was not liable for punitive damages; and (5) Carroll Electric was liable for punitive damages.
After Verdict A was returned, the bifurcated trial continued with the admission of Landowner's Exhibit 162, a "Net Worth Statement[,]" for Carroll Electric; a stipulation by Carroll Electric's trial counsel that Carroll Electric's net worth was $188 million; and closing arguments by counsel regarding the amount of punitive damages *46 the jury should award. The jury then returned "Verdict B[,]" which assessed punitive damages in the amount of $75,000 against Carroll Electric. Landowner moved for an award of attorney fees under section 523.283 on the ground that it had "prevailed in an action for trespass against [Carroll Electric], a rural electric cooperative[.]" The judgment awarded actual damages, punitive damages, and attorney fees as described at the beginning of this opinion.
Carroll Electric timely filed the JNOV motion that (as relevant here) made the same claims as those asserted in the directed verdict motion, and it also claimed the trial court erred in submitting the punitive damages verdict director to the jury. Carroll Electric also filed the remittitur motion, which claimed that: 1) the punitive damages award must be vacated "because it is unsupported by the evidence and cannot stand as a matter of law"; and 2) the attorney fees award should be vacated. Landowner filed an amended motion for attorney fees that sought a recovery for fees and costs incurred up through their responses to Carroll Electric's post-trial motions.
A September 2014 "JUDGMENT ON ALL POST-TRIAL MOTIONS INCLUDING ISSUE OF REMITTUR " ("the September 2014 judgment") denied the JNOV motion, remitted the punitive damages award to $35,000, and denied an additional award of attorney fees to Landowner. As earlier noted, the subsequent appeals by Landowner and Carroll Electric of the September 2014 judgment were dismissed "for lack of a final judgment" because the trial court did not follow Rule 78.10's[9] remittitur procedure so as to "resolve all of the issues relating to the jury's award of punitive damages." Bare , 516 S.W.3d at 396-97.
In April 2017, the trial court entered an order that again denied the JNOV motion, reconsidered and denied the remittitur motion, and ruled that the judgment "is now final for purposes of appeal." This appeal timely followed.
Analysis
Point 1-Evidence of Carroll Electric's Control Over Seven Valleys
Carroll Electric's first point insists that the trial court erred in denying the directed verdict and JNOV motions because Seven Valleys was an independent contractor instead of Carroll Electric's agent, and Landowner "failed to introduce any substantial evidence that Carroll Electric controlled or had the right to control the physical conduct of Seven Valleys in the clearing of the right-of-way[.]"
Our review of "the denial of a motion for directed verdict and the denial of a motion for judgment notwithstanding the verdict is essentially the same." Eisenmann v. Podhorn , 528 S.W.3d 22, 29 (Mo. App. E.D. 2017). The question is "whether the plaintiff made a submissible case, which is a question of law we review de novo." Id. In making that decision, "we view the evidence and all reasonable inferences therefrom in the light most favorable to the plaintiff, and all contrary evidence and inferences are disregarded." Id. at 29-30.
Here, Carroll Electric insists that Landowner did not make a submissible case on the theory of agency. This claim is flawed in two respects. First, it limits agency to a respondeat superior theory by maintaining that the Seven Valleys contract established that Seven Valleys was simply an independent contractor for Carroll Electric-not *47 an employee-and liability under the respondeat superior doctrine only exists if there is a master-servant relationship. Cf. Trinity Lutheran Church v. Lipps , 68 S.W.3d 552, 557 (Mo. App. E.D. 2001) ("the doctrine of respondeat superior ... is derived from the principle that the master, or the employer, controls the actions of the servants, or employees, and that the servants' actions are thereby imputed to the master" and the doctrine "is inapplicable unless a master-servant relationship exists between the parties").
It is true that "liability of an independent contractor cannot flow from a theory of respondeat superior." Blunkall v. Heavy & Specialized Haulers, Inc. , 398 S.W.3d 534, 542 (Mo. App. S.D. 2013), but claiming that the existence of an independent contractor relationship prevents an agency relationship reveals a flawed understanding of agency principles.
"[A]n employer is liable under the theory of respondeat superior for damages attributable to the misconduct of an employee or agent acting within the course and scope of the employment or agency." McHaffie by and Through McHaffie v. Bunch , 891 S.W.2d 822, 825 (Mo. banc 1995) (emphasis added). The term "or" is a conjunction "used as a function word to indicate an alternative[.]" MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 872 (11th ed.2005). If the principal, or employer, has no right to control or direct the physical movements of the agent, the principal is not liable for injury caused by the agent " 'unless the act was done in the manner directed or authorized by the principal [.]' " Douglas [v. National Life & Acc. Ins. Co. of Nashville , 236 Mo.App. 467], 155 S.W.2d [276] at 271 [ (1941) ] (quoting Kourik v. English , 340 Mo. 367, 100 S.W.2d 901, 905 (1936) ).
Id. Generally, the principal may be liable for acts done by the agent in the manner directed or authorized by the principal. See Blunkall , 398 S.W.3d at 542. And a principal is equally liable for the agent's trespass under such circumstances. See Wheeler v. Cmty. Fed. Sav. & Loan Ass'n , 702 S.W.2d 83, 87 (Mo. App. E.D. 1985).
Thus, the issue here is whether substantial evidence was adduced that "[Carroll Electric] either controlled or had the right to control the physical conduct of Seven Valleys[.]" Under those circumstances, even if Seven Valleys would be considered an independent contractor for purposes of the Seven Valleys contract (a matter we do not decide), Seven Valleys would still be an agent of Carroll Electric when acting at the direction of or with the authorization of Carroll Electric. See id. A contract is not necessary to create an agency, and "the relationship may be created by words and conduct." Bach v. Winfield-Foley Fire Prot. Dist. , 257 S.W.3d 605, 608 (Mo. banc 2008).
The second flaw is Carroll Electric's argument that no substantial evidence supports Landowner's claim that Carroll Electric controlled Seven Valleys' conduct because Landowners "are bound by the testimony they gave ... favorable and unfavorable."[10] The two cases cited in support of that proposition, Thaller v. Skinner & Kennedy, Co. , 315 S.W.2d 124, 126-27 (Mo. banc 1958), and Routh v. Burlington N. R.R. Co. , 708 S.W.2d 211, 215 n.2 (Mo. App. W.D. 1986), do not change our obligation to view the evidence in the light most favorable to the verdict *48 and disregard "conflicting evidence and inferences." Edgerton , 280 S.W.3d at 68. The jury has the responsibility to determine witness credibility, resolve conflicting testimony, and weigh the evidence. Cox v. Kansas City Chiefs Football Club, Inc. , 473 S.W.3d 107, 126 (Mo. banc 2015). "The destructive contradictions doctrine provid[ing] that a witness's testimony loses probative value when his or her statements at trial are so inconsistent, contradictory, and diametrically opposed to one another that they rob the testimony of all probative force" has been abolished in our courts. State v. Porter , 439 S.W.3d 208, 210, 213 (Mo. banc 2014) (quotation omitted).
Substantial evidence permitted the jury to find, as the agency instruction postulated, that Carroll Electric "control[led] the physical conduct of [Seven Valleys]." The Seven Valleys contract provided several ways for Carroll Electric to control the actions of Seven Valleys in regard to the clearing of the right-of-way despite the contract's renunciation of "agency" in one provision. The Seven Valleys contract permitted Carroll Electric to cause the removal of any Seven Valleys employee from the project if Carroll Electric deemed it in its best interest, and Carroll Electric could force Seven Valleys to add employees to the project. The number and type of tools and equipment used by Seven Valleys could be controlled by Carroll Electric. The engineer employed by Carroll Electric was the authority to "designate all danger trees which shall be removed or topped at option of [Carroll Electric]." Even if Carroll Electric's engineer recommended the suspension of work for some reason, Seven Valleys could not stop work without the written permission of Carroll Electric. Seven Valleys' documentation of the project was also within the control of Carroll Electric.
The jury could find from the evidence adduced that, in practice, Carroll Electric controlled Seven Valleys. Carroll Electric's supervisor, Mr. Allen, not only inspected Seven Valleys' work, but he "had the ability to correct" it and make sure that Seven Valleys was "following what [Carroll Electric] would want." Carroll Electric's supervisor could have stopped Seven Valleys employees from "putting logs off of the right-of-way[.]" Seven Valleys' president, Mr. Ennes, regarded his employees as being "under the control of" Carroll Electric's supervisor. Indeed, Carroll Electric oversaw the "daily progress" on the project with Seven Valleys' supervisor, and Mr. Ennes never came to Landowner's property. Seven Valleys' supervisor, Mr. Hendrix, spoke with Mr. Allen "every day or every other day" during the project. Carroll Electric's supervisor could direct that a particular tree not be chopped down, and Carroll Electric's engineer was tasked with designating "danger trees[.]"
Substantial evidence also supported a finding that Carroll Electric's control over Seven Valleys' conduct produced a trespass. As work approached Landowner's property, Mr. Allen changed prior instructions and told Mr. Hendrix "to take mature trees 20 foot wide on each side of the north and the south boundary" of the right-of-way. When Mr. Bare challenged the changed instructions, and the ownership of Seven Valleys took the position that the company would not clear anything wider than the right-of-way, Mr. Allen insisted that any tree could be taken. After the area outside the right-of-way was bulldozed, both Mr. Hendrix and Mr. Allen indicated that this was called for by Carroll Electric's plans. The jury could reasonably infer from this evidence that Seven Valleys had acted under Carroll *49 Electric's control in damaging the area outside of the right-of-way.
Point 1 is denied.
Points 2, 3 & 4-Liability for Punitive Damages
We collectively take up points 2, 3, and 4 as they all focus on Carroll Electric's liability for punitive damages. Point 2 claims that the trial court erred in denying the directed verdict and JNOV motions and submitting the issue of punitive damages to the jury in that there was no evidence of outrageous or reckless conduct by Carroll Electric and the submission rested on conduct by Seven Valleys. Point 3 claims the trial court erred in giving the punitive damages instruction when "there was no substantial evidence that any conduct of Carroll Electric was outrageous because of its evil motive or reckless indifference to the rights of others." Point 4 claims that it was error to deny the remittitur motion "to set aside the punitive damage award ... in its entirety" because Landowner's claim "was based upon respondeat superior liability" and "the jury did not find Seven Valleys liable for punitive damages[.]"
While the focus of the attack is on Carroll Electric's punitive damages liability, the procedural posture underlying each point differs,[11] and because Point 4, on its face, does not present a viable claim, we take it up first.
"[A] trial court has broad discretion to remit a punitive damage award if, after reviewing the evidence supporting the jury's award, the court finds the verdict is excessive because the amount exceeds fair and reasonable compensation for the plaintiff's damages." Bare , 516 S.W.3d at 397 (emphasis added). Thus, remittitur is a procedure to correct an excessive verdict. See Chapman v. New Mac Elec. Coop., Inc. , 260 S.W.3d 890, 895 (Mo. App. S.D. 2008) ; see also section 537.068. Remittitur is not a means of nullifying a jury verdict by reducing its damages award to " 'zero[.]' " See Haynes v. Hawkeye Sec. Ins. Co. , 579 S.W.2d 693, 707 (Mo. App. W.D. 1979). Therefore, Carroll Electric could not use the procedure of remittitur to set aside the punitive damages award in its entirety on the theory that Carroll Electric had no liability for punitive damages.
Point 2 attacks the denial of the directed verdict and JNOV motions and submission of punitive damages to the jury, which we review de novo as to whether Landowner made a submissible case, viewing all evidence and the reasonable inferences in the light most favorable to Landowner. See Eisenmann , 528 S.W.3d at 29. "Missouri common law permits an award of punitive damages in an action for trespass." Hostler v. Green Park Dev. Co. , 986 S.W.2d 500, 507 (Mo. App. E.D. 1999). " 'Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or reckless indifference to the rights of others.' " Burnett v. Griffith , 769 S.W.2d 780, 789 (Mo. banc 1989) (quoting Restatement (Second) of Torts, section 908(2) (1979) ). "Whether plaintiffs made a submissible case depends on whether a reasonable juror could have found that [the defendant's] conduct showed complete indifference to or a conscious disregard for the plaintiffs' rights."
*50 Kaplan v. U.S. Bank, N.A. , 166 S.W.3d 60, 73 (Mo. App. E.D. 2003).
Carroll Electric's argument is that Landowner failed to make a submissible case on punitive damages because it did not prove that Carroll Electric's conduct was outrageous because of its own evil motive or reckless indifference to the rights of others and instead "sought to hold Carroll Electric liable for punitive damages for the conduct of Seven Valleys' employees ." The argument simply overlooks the evidence favorable to Landowner.
When Landowner communicated its concern over the vagueness of the "danger tree" language, it was Carroll Electric's supervisor, Mr. Allen, who told Landowner that it had " 'nothing to worry about' " and there would be nothing requiring the right-of-way to be wider than 100 feet apart from "an emergency, an ice-storm-type situation[.]" He assured Landowner that if there was damage outside of the right-of-way, Carroll Electric would "take care of restoring or repairing the damage" submitted in a written claim for such relief. The jury could also credit Mrs. Bare's testimony that the hand-written note about the brush being pushed off the right-of-way was not there when Landowner signed the easement contract and that it only appeared on the copy she subsequently received from Carroll Electric.
The jury was also permitted to credit Mr. Allen's testimony that he was the one who had added the hand-written note to the easement contract and disbelieve his testimony that he did so in the presence of Landowner. The jury could reasonably find that Mr. Allen added the hand-written note after the easement contract was executed to make it appear that Landowner had agreed to something that it had actually rejected. And as the actual clearing work on the project got closer to Landowner's property, Mr. Allen told Mr. Hendrix "to take mature trees 20 foot wide on each side of the north and the south boundary." Mr. Bare told Mr. Allen that he did not want any trees cleared beyond what they had agreed to in the easement, but Mr. Allen replied that "he had a signed easement and that he would take any tree on [Landowner's] place that [Mr. Allen] wished."
Mr. Bare checked on the work done on the right-of-way on most days that the crew was there, but after the clearing crew had worked past Landowner's property and had moved on to the neighbors' property, the Bares went out of town for about four days. They returned to find that a formerly fully-wooded area outside the right-of-way had been bulldozed, Landowner's fence had been damaged, and a silt fence had been put up. Mr. Allen refused to show Mr. Bare a written plan referenced by Mr. Allen to back up his claim that a new area had been identified as requiring clearing. Finally, despite Mr. Allen's promise about how damage claims would be handled, Mr. Bare never received a response from Carroll Electric to Landowner's letter documenting the damage.
Based upon this substantial evidence, a reasonable juror could find that Carroll Electric's conduct was outrageous in that it demonstrated a complete indifference to or a conscious disregard for Landowner's rights. See Kaplan , 166 S.W.3d at 73. As a result, we need not decide whether Carroll Electric's liability for punitive damages could have rested upon the conduct of Seven Valleys alone.
Point 3 notes that the punitive damages verdict director referred to "the conduct of [Carroll Electric]" and instructed the jury to consider whether Carroll Electric's conduct "was outrageous because of [Carroll Electric's] evil motive or reckless indifference to the rights of others[.]" Carroll Electric claims the instruction should not have been given because "there was no *51 substantial evidence that any conduct of Carroll Electric was outrageous because of its evil motive or reckless indifference to the rights of others[.]" We need not belabor our response. The argument fails for the same reason noted in our analysis of Point 2. Carroll Electric simply ignores such evidence.
Carroll Electric also complains-without citation to authority-that the punitive damages verdict director "failed to identify any conduct of Carroll Electric that the jury should consider in awarding punitive damages against it[.]" Because this complaint was not contained in the point relied on, we do not consider it. See Turner v. Pence , 514 S.W.3d 98, 104 (Mo. App. W.D. 2017) (the Court addressed "only the argument properly raised in the point relied on"); see also Rule 84.04(e).
Points 2, 3, and 4 are denied.
Point 6-Amount of Punitive Damages
Carroll Electric claims in its sixth point that if the punitive damages award is not set aside on other grounds, the trial court erred in denying the remittitur motion because the punitive damages verdict "was excessive based on the totality of the surrounding circumstances and violated Carroll Electric's right to due process." Assuming, arguendo , that Carroll Electric's due-process claim was properly preserved,[12] Point 6 is nonetheless without merit because Carroll Electric fails to address the evidence supporting the punitive damages award-the first step in crafting a cogent argument that the award was excessive and violated Carroll Electric's right to due process.
"We afford the trial court broad discretion in deciding whether remittitur should be ordered after a jury verdict." Wilkins v. Board of Regents of Harris-Stowe State Univ. , 519 S.W.3d 526, 541 (Mo. App. E.D. 2017). Therefore, our review of the trial court's remittitur ruling is for abuse of discretion. Id. at 542. Such discretion is abused "when the trial court's ruling is clearly against the logic of the circumstances and is so unreasonable and arbitrary that it shocks one's sense of justice and indicates a lack of careful consideration." Stewart v. Partamian , 465 S.W.3d 51, 56 (Mo. banc 2015). "In reviewing the evidence to determine if the award was manifestly unjust, we do so in the light most favorable to the verdict, and we disregard any contrary evidence." Wilkins , 519 S.W.3d at 542.
"The circuit court should not sustain a motion for additur or remittitur under [section] 537.068 without having determined that the verdict is against the weight of the evidence and that the party moving for additur or remittitur is entitled to a new trial." Badahman v. Catering St. Louis , 395 S.W.3d 29, 38 (Mo. banc 2013). Part of an against-the-weight-of-the-evidence challenge requires the challenger to "identify all of the favorable evidence in the record supporting the existence of" the factual proposition being challenged. Houston v. Crider , 317 S.W.3d 178, 187 (Mo. App. S.D. 2010). Point 6 and its supporting argument do not address the evidence favorable to a finding that Carroll Electric's conduct was outrageous in that it demonstrated a complete indifference to or a conscious disregard for Landowner's rights. "The omission of material favorable *52 evidence from the weighing process strips" Carroll Electric's argument "of any analytical value or persuasiveness." Id. at 189.
Point 6 is denied.
Point 5-Attorney Fees Incurred Below
Carroll Electric challenges the attorney fees award on the ground that such fees are not permitted under section 523.283.4, a statute addressing easements acquired after August 2006 by particular entities, including a "rural electric cooperative[.]" Section 523.283.1. Carroll Electric describes itself as a rural electric cooperative, but it argues that section 523.283.4 is intended to apply only in instances where an "expanded use" is obtained by the entity for an existing easement, and an "expanded use" of the easement was neither sought by nor granted to Carroll Electric.[13]
We review statutory construction and application de novo . State ex rel. Missouri Highways & Transp. Comm'n v. Greenwood , 269 S.W.3d 449, 454 (Mo. App. W.D. 2008). In doing so, we "ascertain the intent of the legislature from the language used[.]" Macon Cty. Emergency Services Bd. v. Macon Cty. Comm'n , 485 S.W.3d 353, 355 (Mo. banc 2016). Our review "presume[s] that each word, clause, sentence, and section of a statute will be given meaning and that the legislature did not insert superfluous language[.]" Id.
Section 523.283.4 provides that "[i]f a property owner prevails in an action for trespass or expanded use against a ... rural electric cooperative, ... such property owner may be awarded reasonable attorneys' fees, costs, and expenses." See also Sterbenz v. Kansas City Power & Light Co. , 333 S.W.3d 1, 8 n.5 (Mo. App. W.D. 2010) (denying homeowners' claim that the trial court instead of a jury should have assessed attorney fees for common law trespass by a public utility and stating, in dicta, that "[a]ttorney's fees, costs and expenses may also be awarded in a trespass action against a public utility pursuant to section 523.283.4").
Our review requires us to give each word of the statute meaning. Macon Cty. Emergency Services Bd. , 485 S.W.3d at 355. As a result, we do not regard "trespass" as a superfluous term placed next to "expanded use[,]" see id. , especially since, as illustrated in our analysis above, the word "or" signals an alternative. See Blunkall , 398 S.W.3d at 542. Thus, under the plain language of section 523.283.4, a "property owner [who] prevails in an action for trespass ... may be awarded reasonable attorneys' fees, costs and expenses."
Point 5 is denied.
Landowner's Motion for Attorney Fees on Appeal
The attorney fees motion contends that Landowner has "incurred significant attorney fees in the review of the record, a review of [Carroll Electric's] Brief, research, and preparation of [Landowner's] Brief multiple times," and that Landowner anticipated incurring additional fees for drafting its reply brief and preparing for oral argument. In opposition, Carroll Electric makes the same arguments we rejected in our analysis of Point 5. The attorney fees motion is granted.
Carroll Electric also contests the appropriate amount of attorney fees if any are awarded. "Although we have the expertise to fix attorney fees on appeal, 'the *53 trial court is in a much better position to hear evidence and argument on this issue and make a determination of the reasonableness of the requested fees and costs[.]' " Percy's High Performance, Inc. v. Krough , 445 S.W.3d 577, 583 (Mo. App. S.D. 2013) (quotation omitted).
The judgment of the trial court is affirmed, and the case is remanded for the trial court to enter an award for Landowner's attorneys' fees on appeal in an amount it determines appropriate.
MARY W. SHEFFIELD, P.J., CONCURS
GARY W. LYNCH, J., CONCURS

This is the second time that this case has come before us. As discussed, infra , this court dismissed a previous appeal by Carroll Electric of a September 2014 "judgment" for lack of a final judgment as it "did not resolve all issues in the case relating to the jury's punitive damage award[.]" Bare v. Carroll Elec. Coop. Corp. , 516 S.W.3d 395, 399 (Mo. App. S.D. 2017). The judgment at issue in this appeal ("the judgment") was the "Amended Judgment" (originally entered in July 2014) that became a final judgment in April 2017.

See Branson West, Inc. v. City of Branson, Mo. , 980 S.W.2d 604, 607 (Mo. App. S.D. 1998) ("if an easement holder, while lawfully on the servient land, exceeds his rights under the easement in either the manner or extent of his use, he becomes a trespasser to the extent of the unauthorized use"). For convenience, we refer to the 100-foot-wide strip of land on Landowner's property more specifically described in the exhibit incorporated into the easement as "the right-of-way."

A satisfaction of judgment as to Seven Valleys in the amount of $12,224.47, plus accrued interest, was filed in the trial court. Counsel for Carroll Electric stated during oral argument that there was no basis to overturn the jury's verdict that Seven Valleys committed common law trespass against Landowner, and Seven Valleys has not filed a brief in the instant appeal.

The points reference a singular motion for directed verdict without further identification, but the record on appeal indicates that as many as three such motions may have been presented to the trial court: one at the close of Landowner's evidence on liability, a renewal of the original motion at the close of all of the evidence on liability, and a final one electronically filed three days after the end of trial. Although the index to the legal file indicates that the "complete" docket sheets are included, the docket sheets included in the legal file do not go back to May 2014. The trial court's notations from the proceedings on May 7-8, 2014 in the legal file reflect two denials of motions for directed verdict, but they do not indicate whether a written motion was filed. The transcript reflects that at the close of Landowner's evidence on liability, Carroll Electric's counsel stated, "Your Honor, I've got an actual written motion I'd like to have as part of the court record and in the court file. I have a copy for you for that purpose." There is no indication, however, that this motion was then filed by trial counsel, and trial counsel went on to "address the [trial c]ourt on [Carroll Electric's] motion" with argument for a directed verdict. Trial counsel's transcribed oral argument supporting Carroll Electric's directed verdict made at the close of Landowner's evidence on liability, infra , renewed at the close of all the evidence on liability, is what we refer to in this opinion as "the directed verdict motion." Cf. Sanders v. Ahmed , 364 S.W.3d 195, 207, 208 (Mo. banc 2012) ("[a] motion for directed verdict at the close of all evidence becomes the meaningful motion to preserve the issue ... prior to submission to the jury[,]" and an oral motion for directed verdict stating specific grounds may be sufficient to preserve the issue for appellate review).

All statutory references are to RSMo 2016.

Mr. Allen testified that his first name is actually "James" and he also used "James M."

A copy of the easement contract was admitted into evidence as Landowner's Exhibit 158, but it is not included with the exhibits deposited with this court. Carroll Electric includes a purported copy of the easement contract as Exhibit CE-J in the exhibits deposited with this court, but Exhibit CE-J does not appear as an admitted exhibit in the transcript. However, Landowner references Exhibit CE-J in its brief, and Landowner does not object to Exhibit CE-J as accurately reflecting the typed language and handwritten entries in blanks within the typed language of the easement contract. Landowner did, however, offer testimony at trial and takes the position in its brief that a handwritten sentence ("handwritten-note") appearing on the easement contract beneath the typed-note was added after Landowner executed the easement contract. Therefore, for both purposes of the record on appeal and review of the evidence, we will treat the easement contract at the time of its execution as being accurately depicted in Exhibit CE-J except for the hand-written note. Cf. J.B. Allen, Inc. v. Pearson , 31 S.W.3d 526, 529 (Mo. App. E.D. 2000) ("matters to which counsel for the adverse party stipulates, agrees, or concedes constitute an exception to the rule that the transcript may not be supplemented by any extraneous matter in one party's brief"); Edgerton v. Morrison , 280 S.W.3d 62, 68 (Mo. banc 2009) (we view the evidence in favor of the verdict and disregard "conflicting evidence and inferences").

Mr. Allen testified that he made the hand-written addition in the presence of Landowner, but the jury was not obligated to credit that testimony. "The jury was at liberty to believe none, part, or all of the testimony of any witness, and we must disregard defendant's evidence, except where it benefits plaintiff, and permit plaintiff a choice of the most favorable combination of facts and inferences." Jordon v. Johnson , 411 S.W.2d 451, 454 (Mo. App. Spfld.D. 1967) (footnote omitted).

Rule references are to Missouri Court Rules (2017).

For instance, Carroll Electric points out that after Mr. Ennes was reminded of the "independent contractor" language in the Seven Valleys contract, Mr. Ennes also testified that Seven Valleys "wasn't under the control of [Carroll Electric's] inspection."

The procedural posture of Points 2 and 3 is not identical. "A submissibility-of-the-claim challenge .... compares the evidence with the substantive law, while the [submissibility-of-the-instruction challenge] compares the evidence specifically with the instruction." Wieland v. Owner-Operator Serv., Inc. , 540 S.W.3d 845, 850 n.3 (Mo. banc 2018).

Carroll Electric insists that it "raised and preserved the constitutional issue that imposition of punitive damages violated its due process rights properly below" and cites its answer to the amended petition and its JNOV motion. The remittitur motion does not contend that the punitive damages award violated Carroll Electric's "right to due process[.]" Nonetheless, the September 2014 judgment found that "the Due Process Clause of the Fourteenth Amendment ... prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor."

Carroll Electric also contends that Seven Valleys was the trespasser, and Seven Valleys is not one of the types of entities specifically listed in section 523.283. See section 523.283.1 and 4. As already addressed, substantial evidence supported the jury's findings that Carroll Electric controlled Seven Valleys' conduct on Landowner's property and Carroll Electric's conduct in doing so was outrageous.