

# In the Missouri Court of Appeals
## Eastern District

### DIVISION IV

| | | |
|---|---|---|
| SAMANTHA KELLEY, | ) | No. ED110609 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court of |
| | ) | St. Francois County |
| vs. | ) | |
| | ) | Honorable Wendy L. Wexler Horn |
| STATE OF MISSOURI, DEPARTMENT OF | ) | |
| CORRECTIONS, | ) | |
| | ) | |
| Appellant. | ) | Filed: September 26, 2023 |

Before Kelly C. Broniec, Sp.J., Philip M. Hess, J., and James M. Dowd, J.

### I.       Introduction

The Missouri Department of Corrections (the "Department") appeals the judgment of the Circuit Court of St. Francois County entered on a jury verdict in favor of plaintiff Samantha Kelley ("Kelley") on her claim of sexual harassment based on a hostile work environment brought under the Missouri Human Rights Act ("MHRA"), Chapter 213 RSMo.  In her petition, Kelley alleged that she was subjected to unwelcome sexual harassment by two non-supervisory male co-workers, and that the Department, despite having actual and/or constructive knowledge of the sexual harassment, failed to take prompt and effective remedial action to stop it.  The jury found in favor of Kelley, and awarded her actual and punitive damages.  The trial court also awarded Kelley her reasonable attorneys' fees, which included a 1.5 multiplier.

The Department raises four points on appeal: (1) Kelley failed to make a submissible case that the Department knew or should have known of the harassment and failed to take prompt and effective remedial action to stop it; (2) Kelley failed to establish that the Department's conduct warranted punitive damages; (3) the punitive damages award was grossly excessive; and (4) the trial court erred in applying a 1.5 multiplier to the attorneys' fees awarded to Kelley. Finding no error, we affirm the judgment in its entirety.

## II. Factual and Procedural History

Viewed in the light most favorable to the judgment, and giving Kelley the benefit of all reasonable inferences, *Newsome v. Kansas City, Mo. Sch. Dist.*, 520 S.W.3d 769, 775 (Mo. banc 2017) (quoting *Fleshner v. Pepose Vision Inst., P.C.*, 304 S.W.3d 81, 95 (Mo. banc 2010)), the record reveals the following relevant facts:

### General Background

Pursuant to § 217.015.1,[1] the Department supervises and manages all correctional centers (i.e., prisons) in the State of Missouri, including the Farmington Correctional Center (the "FCC").

Kelley was hired by the Department in 2004 for the non-supervisory position of Corrections Officer I ("CO I") at the FCC. In November of 2014, Kelley was re-assigned to work as a "wing officer" in Housing Unit 25 ("HU 25") of the FCC, which involved patrolling the different wings of the unit to ensure that offenders were where they were supposed to be and to ensure the safety and security of the inmates and staff in the FCC.

Four CO I's and one supervisory Corrections Officer II ("CO II" or "sergeant") typically worked each shift in HU 25. The entire time Kelley worked in HU 25, one CO II ("the current CO II" or "the CO II on duty") worked Kelley's shift and served as her immediate supervisor. During

---

[1] All statutory references are to RSMo (2016), unless otherwise noted.

2

her regular shifts, Kelley worked with CO I Dwight Yancey ("Yancey") approximately five days per week, and CO I Robert Pearson ("Pearson") approximately three days per week. Both Yancey and Pearson were working in HU 25 when Kelley was assigned to work there in November of 2014. Prior to reporting to the current CO II, Yancey and Pearson reported to a different CO II ("the former CO II") while working in HU 25.

The first floor of HU 25 contained a control room that housed an officer who handled communications to personnel and offenders and controlled offender movement within the unit. The first floor also contained a room primarily used by the sergeants as a shared office space, commonly called the "sergeant's office." The sergeant's office was frequently a gathering space for corrections officers on duty because it contained desks, tables, chairs, filing cabinets, a small refrigerator, a microwave oven, and a telephone, and most CO I's used it during their shifts to perform paperwork, take breaks, and communicate with other CO I's and the CO II on duty.

<u>The Department's policy prohibiting harassment, discrimination, and retaliation</u>

At all relevant times, the Department had a written policy (the "Policy") that expressly prohibited harassment, discrimination, and retaliation on the basis of sex,[2] *inter alia*, and stated that all staff members are required to attend annual training over this topic. Under the Policy, if a staff member believes the conduct of a fellow staff member constitutes any form of harassment or discrimination, they are required to promptly report it to their immediate supervisor or other designated person. The Policy specifically requires any supervisors who experience, witness, or receive a report of discrimination or harassment to report it to the highest-ranking individual at the FCC (*i.e.*, the Warden's Office), whether or not the victim wished to have their complaint investigated.

---

[2] The Department's policy actually uses the term "gender," but since the parties have exclusively used the term "sex" in their briefing, we regard it as a synonym for purposes of this opinion and use it accordingly.

3

The Policy also requires the Department to investigate complaints of harassment or discrimination, which is done by designated "human relations" personnel. Investigations include interviews with the complaining staff member, the alleged perpetrator, and any witnesses. All staff members are required "to cooperate and fully disclose all relevant information during the course of the official investigation."

### Kelley's interactions with Yancey and Pearson

Upon being assigned to HU 25, Kelley immediately began witnessing Yancey and Pearson making offensive jokes and comments of an explicit sexual nature, engaging in offensive discussions about female staff at the FCC, and engaging in a variety of other sexually-oriented crude and offensive behavior. The jokes, comments, discussions, and other behavior occurred "constantly" while Kelley worked in HU 25. Kelley summarized her working relationship with Yancey and Pearson to be "extremely uncomfortable, toxic." Yancy's and Pearson's behavior caused Kelley substantial emotional distress.

The following is a summary of the offensive language and behavior from Yancey and Pearson that Kelley was subject to during her time in HU 25. For purposes of this opinion, we have chosen to describe such instances as generally and sensitively as possible while still conveying the severity of harassment. The men frequently sat outside the control room, watching female staff members sign into HU 25, rating their physical appearances on a numerical scale, and discussing what sex acts they would like to do with the female staff members. Yancey discussed what sex positions he engaged in with his girlfriend, telling Pearson he would record his sexual encounters and send pictures to Pearson. Both Yancey and Pearson "constantly" made gestures simulating the act of masturbation, and on several occasions, Yancey unzipped his pants and pulled his shirt tail through the zipper area to simulate a penis. Finally, Yancey asked Kelley about the

relationship status of another female staff member and asked for other female staff members' personal contact information. When Kelley responded that such comments made new employees feel uncomfortable, Yancey appeared offended by the statement and said if that was the case, the employees should quit.

Although Kelley was the only one present for some of these incidents, the CO II on duty or other staff members were sometimes present, including during their frequent acts of simulating masturbation in the sergeant's office and when Yancey asked for the female staff member's relationship status and phone number. The CO II on duty never spoke to Yancey or Pearson about their conduct. Kelley would sometimes tell Yancey and Pearson she believed their conduct was "disgusting," and ask them to "knock it off." However, anytime she asked them to stop, she believed they perceived it as a "challenge," and they would do it "10 times worse" the next day.

Kelley formally reports Yancey's and Pearson's conduct

On February 25, 2015, after working approximately three months in HU 25, Kelley made a formal complaint regarding Yancey's and Pearson's conduct to the "functional unit manager" of HU 25 (and the current CO II's direct supervisor at the time). Kelley initially made her complaint orally and supplemented with a written statement containing specific examples of the offensive conduct two days later.

The final incident that compelled Kelley to formally report Yancey and Pearson's offensive conduct was a conversation Yancey and Pearson had in the sergeant's office involving a female therapist, who frequently came to HU 25 to counsel the inmates and had previously reported Yancey and Pearson for their conduct. The female therapist's report had resulted in an investigation. Subsequent to the investigation, Kelley heard Yancey call the female therapist an expletive and say that she should have to perform a sex act on the two men in retribution for

reporting their conduct. Only Kelley, Yancey, and Pearson were present for this conversation. As a result of the female therapist's report, the situation escalated beyond simply making Kelley feel "uncomfortable," or even creating a "toxic" environment, but became "scary" for both Kelley and the female therapist.

After Kelley filed her written complaint with the functional unit manager, Kelley, the current CO II, Yancey, and Pearson were all reassigned to work elsewhere while a formal investigation was conducted pursuant to the Policy, which occurred in March and April of 2015. After being interviewed, Kelley returned to working in HU 25 approximately one week later, while the investigation was ongoing, along with the current CO II. At the conclusion of the investigation on April 22, 2015, the Department's investigator issued a written memorandum detailing his findings, including the following conclusion: "Through the interview process, there was testimony to support [Kelley's] allegation that she was subjected to inappropriate behavior by Yancey and Pearson." However, the investigator did not issue or recommend any discipline, which was subsequently determined by other Department officials.

As a result of the investigator's findings, the Department suspended Pearson for three days, without pay, and he did not return to HU 25. The Department issued Yancey a letter of caution, which is not considered discipline under the Policy; rather, it is "notification … for the employee not to engage in those types of behaviors again or they would be subjected to further potential discipline." The Department returned Yancey to HU 25 in April of 2015. When the functional unit manager informed Kelley that Yancey would be returning, she was "crushed" and "went home and cried." Kelley subsequently requested reassignment to a different wing in HU 25 to avoid working with Yancey, and the functional unit manager granted her request. Kelley then requested reassignment out of HU 25 at her earliest opportunity and was moved to the dining shift from 3:00

a.m. to 11:00 a.m. After her reassignment, Kelley did not experience or report any further harassment by Yancey or Pearson. Kelley eventually moved out of the FCC altogether and as of trial, worked at the Potosi Correctional Center.

Prior Instances of Harassment

Prior to Kelley's arrival at HU 25, Yancey and Pearson each received at least one prior letter of caution for their inappropriate behavior. On June 3, 2014, the Department issued letters of caution to Yancey and Pearson for observing a sergeant touch a female employee on the buttocks, in violation of the Policy, but failing to report that conduct, as required under the Policy.

Furthermore, other employees who had worked in HU 25, before Kelley started in November of 2014, made separate complaints of sexual harassment against Yancey and Pearson.

*Sexual harassment complaint against Pearson*

In November of 2013, a female therapist working at the FCC filed a complaint of sexual harassment against Pearson,[3] alleging that he had "been making inappropriate sexual innuendos toward her for approximately one and a half years."[4] After an investigation, the Department concluded that although there was insufficient evidence to conclude that Pearson made unwanted sexual comments to warrant a finding that he committed sexual harassment under the Policy, there was evidence he had engaged in "flirtatious" behavior with the female therapist, which violated the Department's policy regarding staff conduct. Thus, the Department issued Pearson a "letter of caution" under the Policy, warning him that his flirtatious conduct was "inappropriate in the workplace."

---

[3] This is a different female therapist than that which Kelley worked with as discussed in the section titled, "Kelley formally reports Yancey's and Pearson's conduct."

[4] The quoted summary of the female therapist's allegations was contained in the written report, dated December 26, 2013, prepared by the Human Resources officer who conducted the investigation of the female therapist's complaint. However, we note that the record does not contain a copy of the female therapist's written complaint, which is referenced elsewhere in the record on appeal. It is unclear why the female therapist's written complaint was not made a part of the record on appeal.

The record also demonstrates that the former CO II observed Pearson's inappropriate comments and conduct on several occasions, including Pearson commenting on the physical appearance of the female therapists and Pearson simulating the act of masturbation, but never reported Pearson's behavior, requested an investigation, or disciplined Pearson regarding this conduct.

*Sexual harassment complaint against Yancey*

On January 20, 2014, a female CO I who started working in HU 25 around 2008 filed a complaint of sexual harassment against Yancey alleging that he had made offensive comments of a sexual nature, as well as engaged in other conduct she found offensive during the time they worked together in HU 25. The offensive comments and conduct began a few months after she started working as a CO I in HU 25, and continued for approximately five or six years.

The following are specific examples of Yancey's offensive comments and conduct witnessed by the female CO I, some of which were the same types of harassment witnessed by Kelley. We have again omitted graphic details for purposes of this opinion while attempting to convey the seriousness of Yancey's persistent offensive behavior. On several occasions, Yancey bragged about the size of his penis, discussed various women he dated or with whom he had sex in a graphic sexual nature, commented on which female staff members he wanted to have sex with, and made sexually charged comments about staff members' daughters. When a female staff member asked Yancey if she could borrow his lighter, he gave it to her but said she owed him a sexual favor. Yancey simulated sex acts, made gestures simulating the act of masturbation, put substances on his hands to pretend like he had just masturbated, and unzipped his pants so he could put his finger through his pants and simulate a penis. Lastly, Yancey sent the female CO I a picture of himself sitting in a chair, naked and holding his penis; this picture "shocked" and "disgusted"

8

the female CO I, and she promptly deleted it; the next day she told him never to send her anything like that again.

Several of the foregoing incidents occurred in the sergeant's office or in the control room. Although the female CO I was the only one present for some of these incidents, the former CO II was present for many and another CO I was present when Yancey unzipped his pants, using his finger to simulate a penis. The female CO I complained to the former CO II about Yancey's conduct, including a specific complaint about Yancey's comments regarding her two daughters. Although the former CO II listened to her complaint, he did not tell her what, if anything, he would do about it, and he did not otherwise comment on her complaint. The former CO II "took Mr. Yancey aside" and told him that his comments upset the female CO I and needed to stop. Although the former CO II was aware of the Policy, had received numerous trainings on the Policy, and knew the Policy required him to report any violative behavior, the former CO II failed to report these comments to his supervisors, never requested an investigation, and never formally disciplined or reprimanded Yancey for this behavior. Yancey's offensive conduct continued after the female CO I complained to the former CO II and after the current CO II became her supervisor.

The female CO I filed a written complaint, summarizing the offensive comments and conduct listed above, as well as a few other incidents she found annoying or harassing. The Department thereafter conducted a formal investigation and temporarily reassigned Yancey to a different housing unit. A Human Relations investigator from Jefferson City conducted the investigation and interviewed the female CO I, the current CO II, Pearson, Yancey, and five other witnesses the female CO I identified. On February 27, 2014, at the conclusion of his investigation, the investigator prepared a memorandum which detailed his findings and conclusions. The investigator concluded that the female CO I's' sexual harassment allegation "was not

9

substantiated," noting that, "[n]one of the witnesses [the female CO I] listed were able to corroborate any of her allegations." Allegedly, the fellow corrections officers the female CO I identified as witnesses to Yancey's conduct "were there every day," and "they saw it; they heard it." Specifically, the female CO I believed if her co-workers had been "truthful" during the investigation, they would have corroborated her allegations. Thus, the investigator further concluded, "[t]his investigation found no direct evidence that Yancey has acted in a sexually harassing manner." Although the investigator's final report determined that the female CO I's sexual harassment allegation was not substantiated because the witnesses she had identified failed to corroborate any of her allegations, the investigator made the following observation: "It is concerning that many of the witnesses used the exact same terminology in their interviews, making their statements appear to be planned and rehearsed."

Following the investigation, the Department returned Yancey to HU 25, which surprised the female CO I. She personally spoke with the warden of the FCC about why Yancey was returned to HU 25. The warden told her, "they didn't have enough evidence to keep him out, so he was put back at his post."[5] The female CO I thereafter requested a transfer out of HU 25 because she felt Yancey was "retaliating" against her for filing the complaint, and she did not feel comfortable working with him.

Relevant Procedural Posture

In February of 2017, Kelley commenced this action in the Circuit Court of St. Francois County, alleging sexual harassment based on a hostile work environment during her time working in HU 25. Kelley's claim was based on the foregoing conduct of Yancey and Pearson she had

---

[5] Although the investigator's statement regarding the apparent rehearsed interviews "probably" concerned the warden at the time, the warden did not remember taking any action to try to determine whether any of the witnesses who were interviewed as a part of the investigation were being truthful. He also was not aware whether anyone re-interviewed these witnesses to see whether their stories had changed any.

10

personally witnessed and which she found offensive and caused her emotional distress and days missed from work, and the Department's failure to take remedial action, demonstrating their evil motive or reckless indifference to her right to not be sexually harassed or retaliated against. The case was tried to a jury from January 10-12, 2022. At the close of evidence, the Department moved for a directed verdict, or alternatively for judgment notwithstanding the verdict (the "Motion for Directed Verdict"), which the trial court denied. The case was submitted to the jury, which returned a verdict in favor of Kelley, awarding her $120,000 in actual damages and $750,000 in punitive damages. On January, 18, 2022, the trial court entered judgment in accordance with the jury's verdict. On January 21, 2022, Kelley filed a post-trial motion to amend the judgment to include an award of attorneys' fees and costs of litigation, which she supplemented on March 21, 2022 (the "Motion to Amend").

On February 17, 2022, the Department filed a motion for judgment notwithstanding the verdict or, alternatively, for a new trial or remittitur (the "Motion for JNOV"). Relevant to this appeal, the Department argued that the jury never should have considered the issue of punitive damages, or at a minimum, the amount of the punitive damages awarded should be reduced. On March 25, 2022, the trial court denied the Department's Motion for JNOV.

On April 20, 2022, the trial court granted Kelley's Motion to Amend, and entered an amended judgment that awarded Kelley $216,256.87 in attorneys' fees and $4,150.49 in litigation costs, resulting in a total judgment against the Department of $1,090,407.36 (the "Final Judgment"). With respect to the attorneys' fees award, the trial court found that a lodestar of $144,171.25 was a reasonable amount based on the actual hours expended by Kelley's attorneys and the hourly rates requested, which the trial court found reasonable. The trial court also found that it was appropriate to apply a 1.5 multiplier to the lodestar because Kelley's attorneys had

11

demonstrated that their fee was always contingent, and further, "taking this case precluded them from accepting other employment that would have been less risky, and that the time required by the demands of preparing this case for trial delayed work on their other cases." This appeal followed.

### III. Discussion

The Department brings four points on appeal, which we discuss in turn below.

<u>Point I</u>

In its first point, the Department contends the trial court erred in denying its Motion for JNOV because Kelley did not establish that it knew or should have known of the hostile work environment and failed to take proper remedial action in that the Department did not have actual or constructive notice of the hostile work environment before Kelley formally reported it in February of 2015. We disagree.

*Standard of Review*

"In reviewing a denial of a motion for judgment notwithstanding the verdict, we review the record to determine whether the plaintiff made a submissible case." *Williams v. Trans States Airlines, Inc.*, 281 S.W.3d 854, 865 (Mo. App. E.D. 2009) (overruled on other grounds by *Wilson v. Kansas City*, 598 S.W.3d 888, 895 (Mo. banc 2020)); *accord Smith v. Brown & Williamson Tobacco Corp.*, 410 S.W.3d 623, 630 (Mo. banc 2013). "To make a submissible case, a plaintiff must demonstrate that each and every fact essential to liability is predicated upon legal and substantial evidence." *Williams*, 281 S.W.3d at 865. "Substantial evidence is that which, if true, has probative force upon the issues, and from which the trier of fact can reasonably decide the case." *Id.* at 866.

"In determining whether the evidence was sufficient to support the jury's verdict, we review the evidence in the light most favorable to the result reached by the jury, giving the plaintiff the benefit of all reasonable inferences and disregarding evidence and inferences that conflict with the verdict." *Id.*; *accord Smith*, 410 S.W.3d at 630. "A jury verdict will not be overturned unless there is a complete absence of probative facts to support the jury's verdict." *Williams*, 281 S.W.3d at 866; *Sanders v. Ahmed*, 364 S.W.3d 195, 208 (Mo. banc 2012). "Where reasonable minds can differ on the question before the jury, this Court will not disturb the jury's verdict." *Williams*, 281 S.W.3d at 866. Whether the plaintiff made a submissible case is a question of law that we review *de novo*. *Ellison v. Fry*, 437 S.W.3d 762, 768 (Mo. banc 2014).

*Analysis*

The MHRA prohibits an employer from discriminating against an individual with respect to "compensation, terms, conditions, or privileges of employment because of such individual's …sex…." Section 213.055.1(1)(a). "To prevail on a claim of discrimination due to a hostile work environment, a plaintiff must show: (1) she is a member of a protected class; (2) she was subjected to unwelcome sexual harassment; (3) her gender was a contributing factor in the harassment; and (4) the harassment affected a term, condition, or privilege of employment." *M.W. by and through K.W. v. Six Flags St. Louis, LLC*, 605 S.W.3d 400, 409 (Mo. App. E.D. 2020) (citing *Cooper v. Albacore Holdings, Inc.*, 204 S.W.3d 238, 244 (Mo. App. E.D. 2006)). Furthermore, in a case of non-supervisory co-worker harassment, as in this case, a plaintiff must also show "that the employer knew or should have known of the conduct and failed to take proper remedial action." *Id.* (citing *Mason v. Wal-Mart Stores, Inc.*, 91 S.W.3d 738, 742 (Mo. App. W.D. 2002)). "An employer can obtain knowledge of harassment in two ways." *Mason*, 91 S.W.3d at 742. "First, an employer may receive actual notice where the employee has reported the harassing conduct."

13

*Id.* "Second, an employer may be charged with constructive notice where the sexual harassment is so pervasive that the employer should have known of its existence." *Id.*; *Six Flags*, 605 S.W.3d at 414.

In this case, the Department challenges the sufficiency of the evidence supporting the fifth element of Kelley's claim – that the Department knew or should have known of Yancey's and Pearson's conduct and failed to take proper remedial action. Kelley presented substantial evidence at trial that permitted the jury to conclude the Department had actual notice of Yancey's and Pearson's harassing conduct. As noted above, the record demonstrates that Kelley's supervisor witnessed Yancey and Pearson's offensive conduct and, although knowledgeable of the Policy requiring reporting, failed to do so. *See Six Flags*, 605 S.W.3d at 416 (finding that an employer can be charged with constructive notice when information of the harassment "comes to the attention of an employee who has 'a duty to pass on the information to someone within the company who has the power to do something about it.'") (quoting *Diaz v. AutoZoners, LLC*, 484 S.W.3d 64, 84-85 (Mo. App. W.D. 2015)). The same can be said for Yancey and Pearson's prior supervisor, who witnessed their behavior that was the subject of prior complaints against the two men and failed to report it. Additionally, the pattern of persistent harassment spanning over several years, as demonstrated by the prior and then-recent complaints regarding Yancey and Pearson's conduct, is sufficient evidence for the jury to find that the Department had constructive notice of the sexual harassment because the harassment was "so pervasive that the [Department] should have known of its existence. *Mason*, 91 S.W.3d at 742.

*Conclusion*

We find the record, when viewed in the light most favorable to the judgment, reveals that Kelley presented substantial evidence from which the jury could have concluded that the

14

Department knew or should have known of the hostile work environment before Kelley formally reported it to the functional unit manager on February 25, 2015, and that the Department failed to take prompt remedial action to stop it. For these reasons, the trial court did not err in denying the Department's motion for JNOV on the issue of whether the Department knew or should have known of Yancey's and Pearson's conduct and failed to take appropriate remedial action. Point I is denied.

Point II

In its second point, the Department contends the trial court erred in denying its Motion for JNOV because Kelley failed to establish by clear and convincing evidence that its conduct made it susceptible to a punitive damages award in that its conduct was "not outrageous due to evil motive or reckless indifference." However, the Department concedes that this point is not properly preserved for appellate review because although the Department raised the issue during the jury instructions conference on punitive damages and in its Motion for JNOV, it did not raise the issue in its Motion for Directed Verdict. Therefore, under *Wilkins v. Bd. of Regents of Harris-Stowe State Univ.*, 519 S.W.3d 526, 544-45 (Mo. App. E.D. 2017), this claim is not preserved for our review. The Department requests plain error review under Rule 84.13(c).[6]

*Standard of Review*

Rule 84.13(c) provides that "[p]lain errors affecting substantial rights may be considered on appeal, in the discretion of the court, though not raised or preserved, when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." Although the rule makes clear that we have discretion to review an unpreserved claim for plain error, our Supreme Court has

---

[6] All rule references are to Missouri Supreme Court Rules (2022), unless otherwise specified. We also note that in its brief, the Department cited to Rule 84.14(c), which does not exist. We presume the Department intended to cite to Rule 84.13(c), and address Point II accordingly.

15

expressly stated that such review is "rarely" granted in civil cases. *See Mayes v. St. Luke's Hosp. of Kansas City*, 430 S.W.3d 260, 269 (Mo. banc 2014); *see also Flood ex rel. Oakley v. Holzwarth*, 182 S.W.3d 673, 680 (Mo. App. S.D. 2005) (recognizing that we should only "rarely" reverse for plain error in civil cases, and should only do so "in those situations when the injustice [] of the error is so egregious [sic] as to 'weaken the very foundation of the process,' and 'seriously undermine confidence in the outcome of the case'" (quoting *Davolt v. Highland*, 119 S.W.3d 118, 136 (Mo. App. W.D. 2003))).

Missouri courts will only review an unpreserved point for plain error if there are "substantial grounds for believing that the trial court committed error that is evident, obvious and clear," and where the error "resulted in manifest injustice or miscarriage of justice." *Mayes*, 430 S.W.3d at 269 (quoting *In re Adoption of C.M.B.R.*, 332 S.W.3d 793, 809 (Mo. banc 2011)); *accord Cooper v. Chrysler Group, LLC*, 361 S.W.3d 60, 64 (Mo. App. E.D. 2011). "This process involves two steps: First, we must determine whether the trial court actually committed evident, obvious and clear error that affected substantial rights; and second, we must determine whether the evident, obvious, and clear error resulted in manifest injustice or a miscarriage of justice." *Cooper*, 361 S.W.3d at 64.

Whether there is sufficient evidence to support an award of punitive damages is a question of law. *Drury v. Mo. Youth Soccer Ass'n, Inc.*, 259 S.W.3d 558, 573 (Mo. App. E.D. 2008); *Brady v. Curators of Univ. of Mo.*, 213 S.W.3d 101, 109 (Mo. App. E.D. 2006). In making this determination, "we view the evidence and all reasonable inferences in the light most favorable to submissibility and we disregard all evidence and inferences which are adverse thereto." *Drury*, 259 S.W.3d at 573. Furthermore, "[o]nly evidence that tends to support the submission should be considered." *Id.*

16

*Analysis*

In arguing the trial court erred in denying its Motion for JNOV, the Department contends the trial court committed two specific errors: (1) submitting the issue of punitive damages to the jury; and (2) failing to set aside the jury's punitive damages award. In support of both sub-points, the Department argues that the record does not provide a sufficient factual basis for the punitive damages award.

"Section 213.111 authorizes the trial court to award punitive damages in an action under the MHRA." *Holmes v. Kansas City Mo. Bd. of Police Comm'rs, ex rel. Its Members*, 364 S.W.3d 615, 628 (Mo. App. W.D. 2012). "For punitive damages to be submitted to the jury, the evidence and its reasonable inferences must allow a reasonable juror to conclude that it was highly probable that the defendant acted with 'evil motive or reckless indifference.'" *Id.* (citing *Howard v. Kansas City*, 332 S.W.3d 772, 788 (Mo. banc 2011)). "An evil intent may also be inferred where a person recklessly disregards the rights and interests of another person." *Drury*, 259 S.W.3d at 573. Finally, we recognize that "[p]unitive damages are an extraordinary and harsh remedy and should be applied only sparingly." *Id.*

In this case, we decline to conduct plain error review of Point II because we do not believe substantial grounds facially appear to believe that the trial court committed evident, obvious, or clear error that resulted in "manifest injustice or miscarriage of justice." *Cooper*, 361 S.W.3d at 64. After reviewing the entire record, and viewing that evidence in the light most favorable to the judgment, the jury was presented with clear and convincing evidence that the Department's conduct was with "reckless indifference." *See Holmes*, 364 S.W.3d at 628. Point II is denied.

Point III

17

In its third point, the Department contends the trial court erred in denying its motion for remittitur with respect to the punitive damages award because it was grossly excessive and arbitrary in that the degree of reprehensibility of its conduct was low and the ratio of actual harm to the punitive damages award was impermissibly high. We disagree.

*Standard of Review*

"Generally, the decision to award punitive damages is peculiarly committed to the jury and trial court's discretion, and the appellate court will only interfere in extreme cases." *Poage v. Crane Co.*, 523 S.W.3d 496, 522 (Mo. App. E.D. 2017). "Accordingly, we review the denial of remittitur of punitive damages using an abuse of discretion standard." *Id*. (citing *Call v. Heard*, 925 S.W.2d 840, 849 (Mo. banc 1996)).

"For punitive damages, an abuse of discretion is established only when the size of the award is manifestly unjust, and so disproportionate to the relevant factors that it reveals improper motives or a clear absence of the honest exercise of judgment." *Id*. (quoting *Martin v. Survivair Respirators, Inc.*, 298 S.W.3d 23, 35 (Mo. App. E.D. 2009)). "We view the evidence and all reasonable inferences therefrom in the light most favorable to the trial court's decision." *Id*. Furthermore, we do not weigh the evidence and our inquiry is limited to determining whether the jury's verdict is supported by substantial evidence. *Id*. "[W]hen the trial court approves a jury's verdict, its discretion is practically conclusive." *Id*. (quoting *Delacroix v. Doncasters, Inc.*, 407 S.W.3d 13, 36 (Mo. App. E.D. 2013)). "However, we review the constitutionality of the imposition of punitive damages *de novo*." *Id*.

*Standard for Considering a Request for Remittitur of Punitive Damages*

"Punitive damages are subject to the limitations of the Due Process Clause of the Fourteenth Amendment, which 'prohibits the imposition of grossly excessive or arbitrary

18

punishments on a tortfeasor.'" *Mignone v. Mo. Dept. of Corr.*, 546 S.W.3d 23, 43 (Mo. App. W.D. 2018) (quoting *Lewellen v. Franklin*, 441 S.W.3d 136, 145 (Mo. banc 2014)); *accord Wilkins*, 519 S.W.3d at 546. When a punitive damages award is grossly excessive, it no longer furthers the legitimate purposes of punishing unlawful conduct and deterring its repetition, and instead constitutes an arbitrary deprivation of property. *Wilkins*, 519 S.W.3d at 546 (quoting *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003)); *see also Diaz*, 484 S.W.3d at 89. "Accordingly, punitive-damage awards that are grossly excessive violate a tortfeasor's substantive right of due process." *Wilkins*, 519 S.W.3d at 546.

> [C]ourts reviewing punitive damages [are instructed] to consider three guideposts: (1) the reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages award and penalties authorized or imposed in comparable cases.

*Mignone*, 546 S.W.3d at 43 (citing *State Farm*, 538 U.S. at 418)); *accord Wilkins*, 519 S.W.3d at 546. However, in MHRA cases, such as this one, only the first two guideposts are considered, as the third—comparative penalties—is "inconsequential." *Mignone*, 546 S.W.3d at 43; *Wilkins*, 519 S.W.3d at 546.

*Analysis*

Based on our review of the entire record, and viewing the evidence and all reasonable inferences therefrom in the light most favorable to the jury's punitive damages award, we cannot say that the trial court abused its discretion in denying the Department's motion for remittitur of the award. We discuss the first two "guideposts" for considering such a motion.

(1)     Degree of Reprehensibility

The first guidepost—the degree of reprehensibility of the defendant's conduct—is generally considered "the most important indicium of the reasonableness of a punitive-damage

19

award." *Wilkins*, 519 S.W.3d at 546 (citing *Blanks*, 405 S.W.3d at 410). In evaluating the reprehensibility of the defendant's conduct, we consider whether:

[T]he harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health and safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Id.* (quoting *Estate of Overbey v. Chad Franklin Nat'l Auto Sales North*, *LLC*, 361 S.W.3d 364, 373 (Mo. banc 2012)); *Mignone*, 546 S.W.3d at 43-44 (quoting *State Farm*, 538 U.S. at 419).

In this case, the Department argues that the jury's award was arbitrary and grossly excessive because its conduct did not cause Kelley any "direct physical harm." Although the Department acknowledges that Kelley experienced "physical problems brought on by stress," it attempted to minimize this harm by suggesting that it was not so serious that she sought medical attention. Although Kelley concedes there was no physical harm, she emphasizes that she indeed suffered emotional and psychological harm, and further noted that Missouri courts have found this to be a relevant factor in evaluating the reprehensibility of a defendant's conduct, citing *Diaz*, 484 S.W.3d at 96; *Mignone*, 546 S.W.3d at 43-44; and *Wilkins*, 519 S.W.3d at 546-47.

Next, the Department acknowledges that Yancey and Pearson's conduct "involved repeated actions," but suggests that its own conduct did not. However, there was evidence presented to the jury that the Department "enabled" the harassing conduct of Yancey and Pearson by "repeatedly failing to take action to stop their conduct from occurring even though [the Department's] supervisors were aware of it." By allowing their inappropriate conduct to continue for several years, it became more severe and aggressive, and Kelley specifically testified that she became concerned not only for her own safety and welfare, but also that of a female coworker who previously reported their harassment. Finally, even after Kelley formally reported Yancey's and

20

Pearson's conduct and the Department found that some of her allegations were corroborated, the Department allowed Yancey to return to HU 25 with her and did not take any "meaningful action" to ensure the harassing conduct stopped.

Therefore, we find that there was sufficient evidence presented at trial regarding the reprehensibility of the Department's conduct that the jury's punitive damages award was not grossly excessive.

(2)     Ratio

"The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." *Diaz*, 484 S.W.3d at 91 (quoting *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 580 (1996)). However, "[t]he [United States] Supreme Court has 'consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award.'" *Id*. (quoting *BMW*, 517 U.S. at 582). Other Missouri courts have similarly recognized that, "[n]o 'rigid benchmarks' or 'mathematical formulas' exist, and we must consider the precise award based on the 'peculiar facts and circumstances of the defendant's conduct and the harm to the plaintiff.'" *Wilkins*, 519 S.W.3d at 547 (quoting *Blanks v. Fluor Corp.*, 450 S.W.3d 308, 411 (Mo. App. E.D. 2014)). Missouri courts have also recognized that although there is no "precise formula," the United States Supreme Court has held that "an award of a single-digit ratio would be more likely to comport with due process requirements and still achieve the state's goals of deterrence and retribution." *Id*. (citing *State Farm*, 538 U.S. at 416). In this regard, "[l]ow awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, … the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine." *Diaz*, 484 S.W.3d at 91 (quoting *BMW*, 517 U.S. at 582).

21

"In most cases, the ratio will be within a constitutionally acceptable range, and remittitur will not be justified on this basis." *Id*. (quoting *BMW*, 517 U.S. at 583).

In this case, the ratio of punitive damages ($750,000) to the actual damages ($120,000) was 7:1, which is well within the single-digit range that is generally considered by the United States Supreme Court to comport with due process. *State Farm*, 538 U.S. at 416. Furthermore, we believe that Kelley's injuries were hard to detect and their value was difficult to determine, which further supports the constitutionally of the jury's award. *Diaz*, 484 S.W.3d at 91.

*Conclusion*

The trial court did not abuse its discretion in denying the Department's motion for remittitur with respect to the jury's $750,000 award of punitive damages. Point III is denied.

Point IV

In its fourth point, the Department contends that the trial court erred in applying a 1.5 multiplier to the attorneys' fees award because Kelley's application for attorneys' fees did not provide any factual basis to support the trial court's finding that taking this case precluded Kelley's attorneys from accepting other employment that would have been less risky.[7] We disagree.

*Standard of Review*

A trial court is considered to be an expert on attorney fees in a given case "because of its familiarity with all of the issues and the character of the legal services rendered." *Harrison v. Harris-Stowe State Univ.*, 626 S.W.3d 843, 860 (Mo. App. E.D. 2021). Therefore, "[t]he trial court's award of attorneys' fees is reviewed for an abuse of discretion." *Berry v. Volkswagen Grp. of Am., Inc.*, 397 S.W.3d 425, 430 (Mo. banc 2013). "To demonstrate an abuse of discretion, the

---

[7] The Department does not take issue with the lodestar amount determined by the trial court. Rather, the Department only challenges the 1.5 multiplier to the lodestar amount, which the trial court applied in recognition of the risk undertaken by Kelley's counsel.

22

complaining party must show the trial court's decision was against the logic of the circumstances and so arbitrary and unreasonable as to shock one's sense of justice." *Id.* at 431. We should not reverse an attorneys' fee award unless "the amount awarded is arrived at arbitrarily or is so unreasonable that it indicates indifference and a lack of proper judicial consideration." *Harrison*, 626 S.W.3d at 853. Furthermore, "[w]e presume an award of attorneys' fees is correct, and the complaining party has the burden to prove otherwise." *Id.* at 860.

*Attorneys' Fees Awards under the MHRA*

The General Assembly enacted § 213.111.2 "to authorize an award of 'reasonable attorney fees' to the prevailing party in an MHRA action." *Harrison*, 626 S.W.3d at 860 (citing *Wilson*, 598 S.W.3d at 896). Specifically, "[u]nder [§] 213.111.2, prevailing employees receive an award of attorney fees 'as a matter of course[.]'" *Id.* (quoting *Gilliland v. Mo. Athletic Club*, 273 S.W.3d 516, 523 (Mo. banc 2009)). "The authorization for an award of attorney fees under [§] 213.111.2 is similar to a federal counterpart, 42 U.S.C. 1988, under which attorneys' fees are recovered unless circumstances exist that would render an award of such fees unjust." *Id.*

Factors relevant to a trial court's award of fees pursuant to § 213.111.2 are: (1) the customary rates charged by the attorneys involved in the case and those charged by other attorneys in the community for similar services; (2) the number of hours reasonably expended; (3) the nature and character of the services rendered; (4) the degree of professional ability required; (5) the nature and importance of the subject matter; (6) the amount involved or the result obtained; and (7) the vigor of the opposition. *Id.* (citing *Wilson*, 598 S.W.3d at 896).

*Analysis*

The Department argues that nothing in Kelley's attorney's affidavit asserts that rejected cases were *less risky* than Kelley's case, and further, does not establish that they would have

engaged in hourly billing for any of the rejected cases. The Department focuses on the following statement in the affidavit: "[B]ecause of the time commitment required to adequately represent [Kelley] in this case, the attorneys in my firm were forced to reject other potential fee-generating cases and postpone work on other pending cases." While hourly-billed cases are generally considered to be less risky than contingent-fee cases (such as this one), hourly billing is far from the only factor in assessing the relative risk assumed by counsel in representing clients, as we take judicial notice that each case has a unique risk profile, and there can be varying degrees of risk even among contingent fee cases.

The Department also discusses the Supreme Court's analysis in *Berry v. Volkswagen Group of America*, which found that a 2.0 multiplier was warranted to fully compensate plaintiff's counsel. 397 S.W.3d at 432. In addressing the defendant's argument that the trial court erred in applying this multiplier, *Berry* initially rejected adopting the multi-factor approach taken by the United States Supreme Court in *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542 (2010). Rather, the only clear rule adopted in *Berry* with respect to applying a multiplier is that a trial court should "avoid awarding a multiplier based upon facts that it considered in its initial determination of the lodestar amount." *Id*. at 432 (citing *Perdue*, 559 U.S. at 553). In this regard, *Berry* noted that the trial court premised its application of a multiplier on "a list of enumerated factors," but further noted that several of them were duplicative of the factors utilized in its initial calculation of the lodestar amount. *Id*. More to the point, *Berry* noted that the following three factors "directly support" the application of a multiplier and demonstrated that the trial court did not abuse its discretion: (1) that class counsel's fee was always *contingent* (unlike those of defendant's counsel); (2) that "taking this case precluded class counsel from accepting other employment that would have been less risky;" and (3) that "the time required by the demands of preparing this cause for

24

trial delayed work on class counsel's other work." *Id*. at 432-33.[8] However, as Kelley correctly noted, the foregoing three factors were not held to be strict requirements or elements requiring the absence of any one element to preclude the application of a multiplier. Rather, reading *Berry* (and its progeny)[9] in proper context, we believe that each case should be decided on a case-by-case basis, with due regard given to the three aforementioned factors relied upon by the trial court in *Berry*. *See also Zweig v. Metro. St. Louis Sewer Dist.*, 412 S.W.3d 223, 249-50 (Mo. banc 2013) (recognizing that "*Berry* analyzed—and affirmed—the trial court's use of a multiplier under Missouri's time-tested abuse of discretion standard). Therefore, we reject a reading of *Berry* whereby these three factors are deemed requirements, as the Department suggests.

*Conclusion*

In this case, after reviewing the evidence before the trial court in connection with Kelley's request or attorneys' fees, we cannot say that the court abused its discretion in applying a 1.5 multiplier to the lodestar amount, where there was certainly evidence before the court consistent with two of the three factors set forth in *Berry*. Point IV is denied.

<u>Kelley's Motion for Attorneys' fees on Appeal</u>

Prior to submission of this case on appeal, as the prevailing party below, Kelley filed a motion seeking her attorneys' fees on appeal pursuant to § 213.111.2 and Local Rule 400, arguing

---

[8] We note that *Berry* involved a class action claim brought under the Missouri Merchandising Practices Act, Chapter 407, RSMo (2016), which, like the MHRA, permits an award of attorneys' fees to a prevailing party pursuant to § 407.025.2. Although the principles discussed in *Berry* regarding the award of attorneys' fees are not binding in MHRA cases, we nonetheless find *Berry* to be highly instructive here.

[9] *See, e.g., Terpstra v. State*, 565 S.W.3d 229, 251-52 (Mo. App. W.D. 2019) (holding that the trial court did not abuse its discretion in applying a 1.5 multiplier in an MHRA case); *Williams v. Kansas City*, 641 S.W.3d 302, 333-34 (Mo. App. W.D. 2021) (holding that the trial court did not abuse its discretion applying a 1.5 multiplier in an MHRA case); *Gray v. Mo. Dept. of Corrections*, 635 S.W.3d 99, 105-06 (Mo. App. W.D. 2021) (holding that the defendant did not preserve its argument that the trial court erred in adopting a 1.5 multiplier in an MHRA case, but further recognizing that a trial court may determine attorneys' fees "without the aid of evidence"); *Alhalabi v. Mo. Dept. of Corr.*, 662 S.W.3d 180, 197 (Mo. App. W.D. 2023); *Westmoreland v. Midwest St. Louis, LLC*, 623 S.W.3d 618, 641-42 (Mo. App. E.D. 2021) (holding that the trial court did not abuse its discretion in adopting a 3.0 multiplier in a case brought under the Motor Fuel Marketing Act, § 416.635).

25

that the MHRA permits courts to award court costs and reasonable attorney fees to prevailing parties and that if we affirm the judgment of the trial court, she will continue to be the prevailing party. Kelley requests $23,095.00 for her reasonable attorneys' fees and $763.50 for her costs of litigation in connection with this appeal. The Department has objected to the hourly rate requested by Kelley.

Under § 213.111.2, "the court should award attorneys' fees unless special circumstances would render such an award unjust." *See also Turner v. Kansas City Pub. Sch.*, 488 S.W.3d 719, 726 (Mo. App. W.D. 2016) (quoting *McCrainey v. Kansas City Mo. Sch. Dist.*, 337 S.W.3d 746, 756 (Mo. App. W.D. 2011)). This provision applies to fees incurred on appeal from the trial court's judgment. *Id.* The Department does not claim that an award would be unjust, just that the award would be an unreasonable amount. "In the absence of any showing of special circumstances to render an award unjust," we must grant Kelley's motion for attorneys' fees on appeal. *Id.*

"While 'appellate courts have the authority to allow and fix the amount of attorneys' fees on appeal, we exercise this power with caution, believing in most cases that the trial court is better equipped to hear evidence and argument on this issue and determine the reasonableness of the fee requested.'" *Berry*, 397 S.W.3d at 433 (quoting *Rosehill Gardens, Inc. v. Luttrell*, 67 S.W.3d 641, 648 (Mo. App. W.D. 2002)). Therefore, we remand this case to the trial court to determine the appropriate amount of attorneys' fees for counsel's appellate work.

## IV.    Conclusion

For the reasons set forth herein, we affirm the judgment of the trial court and grant Kelley's motion for attorneys' fees on appeal. The cause is remanded to the trial court for further determination of the appropriate amount of attorneys' fees on appeal to which Kelley is entitled.

PER CURIAM